Edward BARKAUSKAS,
Petitioner–Appellant,

v.

Michael P. LANE, Director, Illinois Department of Corrections, and James Fairman, Warden, Joliet Correctional Center, Respondents–Appellees.

No. 88–1877.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1989.

Decided July 11, 1989.

Rehearing Denied Sept. 11, 1989.

Richard F. Faust, Chicago, Ill., for petitioner-appellant.

**1032**

Sally L. Dilgart, Chicago, Ill., for respondents-appellees.

Before POSNER, RIPPLE and MANION, Circuit Judges.

POSNER, Circuit Judge.

An Illinois jury convicted Edward Barkauskas of murdering his wife, and the judge sentenced him to prison for the rest of his life. After exhausting his state remedies, see *People v. Barkauskas*, 147 Ill. App.3d 360, 100 Ill.Dec. 821, 497 N.E.2d 1183 (1986), cert. denied by Ill.Sup.Ct., Barkauskas sought federal habeas corpus, which was denied. The question presented by his appeal is whether the prosecutor at Barkauskas's criminal trial withheld material evidence favorable to the defense.

The main witness against Barkauskas was James Galason, an eighteen-year-old former mental patient. A participant in the murder, he testified as follows in exchange for receiving a sentence of twenty years for his part in the crime. Barkauskas had asked Galason to murder Barkauskas's wife, Joanne; and Galason had agreed to do so in exchange for a promise of the balance of a life insurance policy on Joanne, minus funeral expenses. Several days after the deal was struck, as Galason and his roommates, Kenneth and Joseph Beringer, were walking down the street, Kenneth pulled out a photograph of Joanne and said, "We'll see who gets her first." Later Barkauskas visited Galason and urged him to act soon, as Joanne was about to visit a lawyer about getting a divorce. Barkauskas requested Galason to shoot Joanne below the neck so that she could have an open-casket funeral. Thus does life imitate art; for Othello had told the sleeping Desdemona, "Be thus when thou art dead, and I will kill thee, / And love thee after."

On the eve of the murder Barkauskas gave Galason a ride home and told him to kill Joanne the next day as she walked to the bus stop. Early the next morning the Beringers wakened Galason to tell him they had stolen a getaway car. Joseph Beringer agreed to do the actual shooting and armed himself with a sawed-off shotgun. Barkauskas drove Galason and Joseph Beringer (Kenneth decided to stay home) to the place where the getaway car was parked, and then continued on to Skokie to create an alibi.

Galason and Joseph Beringer drove to an alley near the bus stop. Joseph left the car and hid near a garage. As Joanne walked past he shot her twice, then returned to the car and drove off with Galason. They abandoned the car near some railroad tracks and hid the gun in nearby weeds. (All this, we emphasize, is according to Galason.) But it was too late; the car had been noticed at the scene of the crime and followed by the police, who arrested Galason and Joseph Beringer as they were fleeing from the getaway car and recovered Joanne's photograph from their residence.

Barkauskas, testifying in his defense, admitted knowing Galason and giving him a ride home the night before the shooting but denied having hired him to murder Joanne. He also testified that he did not know how the Beringers had gotten a photograph of her, a photograph he claimed never to have seen. After the murder he had told the police that his wife had probably been killed for her jewelry, but no jewelry had been removed from her body and her purse was found with more than $50 in it.

The Beringers were tried shortly after Barkauskas was convicted, and were also convicted. Joseph was sentenced to natural life in prison and Kenneth to thirty years. At their trial the defense called an eyewitness to the murder, Harvey Webb, who had not testified at Barkauskas's trial. Webb testified that James Galason, not Joseph Beringer, had fired the shotgun at Joanne. He said he knew this because Galason had long blond hair which the recoil from the shotgun blast had caused to wave in the air; Joseph Beringer has short brown hair. Webb also testified that it was on February 21—almost three weeks after Barkauskas's conviction—that he had told the prosecutor in the Beringers' case (the same prosecutor who had prosecuted Barkauskas) that Galason was the triggerman.

After learning of Webb's testimony at the Beringers' trial, Barkauskas moved for a new trial. The judge denied the motion after a hearing in which the prosecutor testified that until February 21 Webb had identified only Joseph Beringer as the triggerman, never Galason. In fact Webb had identified Galason as the triggerman much earlier, at a line-up held shortly after the murder, but later Webb had become a fugitive from justice and he did not resurface until after Barkauskas was tried.

At first glance it might seem quite immaterial whether Galason or one of the Beringers was the triggerman, since Galason's testimony was that Barkauskas had hired all three, or at least had hired Galason and authorized him to associate the Beringers with him in the venture. However, if the jury had thought Galason was the triggerman it might have doubted his testimony for two reasons. First, as the triggerman he would be an even more heinous criminal, and perhaps therefore even less worthy of belief than as an accomplice. Second and more important, if he was the triggerman this would give him a strong motive for lying in order to inculpate Barkauskas. He might have been singing to avoid imprisonment for his natural life or even the death penalty, since as the triggerman he might have been a candidate for the death penalty, and if not then certainly for imprisonment for natural life—Joseph Beringer *was* sentenced to prison for his natural life, the trial judge having disbelieved Webb and concluded that Joseph Beringer was the triggerman. See *People v. Beringer*, 151 Ill.App.3d 558, 562, 104 Ill.Dec. 916, 918, 503 N.E.2d 778, 780 (1987). And unless the jury believed Galason it could not convict Barkauskas. True, Galason's testimony was corroborated by the photograph of Joanne, the circumstances of the murder, and the prior acquaintance between him and Barkauskas; but these pieces of evidence were not enough without Galason's testimony to establish Barkauskas's guilt beyond a reasonable doubt.

■ The principle that requires the prosecution to disclose exculpatory materials upon request, see *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), extends to materials that would tend to exculpate the defendant by undermining the credibility of a government witness. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *United States v. Douglas*, 874 F.2d 1145, 1163 (7th Cir.1989); *United States v. Herrera–Medina*, 853 F.2d 564, 567 (7th Cir.1988). And before his trial Barkauskas had made a general request for exculpatory materials. But he does not argue that the state had a duty to disclose Webb's identification of Galason even if the prosecutor didn't know about Webb's identification till after Barkauskas's trial. And he does not argue that the knowledge possessed by whichever prosecutor was present at the line-up should be imputed to Barkauskas's prosecutor; perhaps he should have argued this. See *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391–92 (7th Cir.1985).

■ So the only question is whether the prosecutor knew before Barkauskas's trial that Webb had identified Galason at the line-up as the triggerman. The state court's finding that the prosecutor did not know is entitled to deference, but only if "the material facts were ... adequately developed at the State court hearing," 28 U.S.C. § 2254(d)(3), a condition that may not have been fulfilled here. Webb had identified Galason as the triggerman at a line-up shortly after the murder, and there was testimony at Barkauskas's trial that Webb had been an eyewitness to the crime. It seems improbable that the prosecutor would not have been informed about the line-up. So far as we are able to determine, however, the question whether he had been informed was not explored at the only evidentiary hearing held on Barkauskas's motion for a new trial, a hearing at which the prosecutor merely stated that until February 21 Webb had identified only Joseph Beringer as the triggerman. If the prosecutor was sincere in saying this, then it means he didn't know about the line-up. He may have been sincere; on the other hand the statement, implying as it did that Webb had consistently identified Joseph Beringer as the triggerman, is perplexing.

Webb had just reappeared after being a fugitive; there was no *history* of his having identified Beringer. As far as we can tell, Webb's only previous identification was of Galason, and occurred at the line-up.

All this is terribly confusing, and, especially given the severity of Barkauskas's sentence, would seem to warrant further exploration by the district court, provided we can say that the failure to reveal Webb's identification of Galason to the defense was a material omission, in the sense that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley, supra,* 473 U.S. at 682, 105 S.Ct. at 3383. The state argues that Webb's testimony at the Beringers' trial shows that he was unworthy of belief—that he was, as the state had called him then, "a puke" and "garbage." Yet the state took his testimony sufficiently seriously to resort to tactics of impeachment that led the Illinois Appellate Court to reverse the convictions of both Beringers. See *People v. Beringer,* 151 Ill.App.3d 558, 104 Ill.Dec. 916, 503 N.E.2d 778 (1987); *People v. Beringer,* 156 Ill.App.3d 309, 108 Ill.Dec. 882, 509 N.E.2d 578 (1987). Barkauskas's counsel might have been able to use Webb's testimony to impeach Galason effectively.

This is speculation; we expect Barkauskas would have been convicted anyway. The photograph was particularly damaging, and no motive can plausibly be assigned for the crime except on the assumption that Barkauskas indeed hired Galason and his pals to commit it; remember that no effort was made to rob the victim. So even if the jury had doubted Galason's testimony that Joseph Beringer had been the triggerman, it is unlikely that it would have disbelieved his testimony that Barkauskas was behind the murder. Another point pressed by the state, and corroborated by the transcript of Barkauskas's trial (belatedly submitted to this court by his counsel after oral argument), is that Barkauskas's trial counsel had and used abundant impeachment material on Gala-

son—his prior arrest record, his psychiatric history, his poor reputation for telling the truth, his reluctance to take responsibility for his own actions and concomitant tendency to shift blame to others, and the fact that he was testifying in exchange for a twenty-year sentence that was light in the circumstances. But of course the very abundance of other impeaching evidence may have meant that knowledge of Webb's identification of Galason at the line-up as the triggerman would have pushed the jury over the edge into the region of reasonable doubt that would have required it to acquit Barkauskas.

Although the question is close, we are not able to say that disclosure of Webb's identification would not have been material within the meaning of the *Brady* line of cases. It therefore becomes critical to determine whether the prosecution concealed this information from the defense, a question on which the state-court record is too sparse to enable an informed judgment. We therefore reverse the judgment of the district court and remand the case for an evidentiary hearing to determine whether the state violated the *Brady* rule.

REVERSED AND REMANDED, WITH DIRECTIONS.