**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Rafael ABELLO–SILVA,**
**Defendant–Appellant.**

**No. 90–5161.**

United States Court of Appeals, Tenth Circuit.

Nov. 6, 1991.

---

Tony M. Graham, U.S. Atty. (David E. O'Meilia and Kathryn H. Phillips, Asst. U.S. Attys. with him, on the brief), Tulsa, Okl., for plaintiff-appellee.

Randy Schaffer P.C., Houston, Tex., for defendant-appellant.

Before MOORE, and McWILLIAMS, Circuit Judges, and KANE *, Senior District Judge.

KANE, Senior District Judge.

Appellant, Jose Rafael Abello–Silva, (hereafter Abello) a citizen of the Republic of Colombia, was extradited to the United States to face drug conspiracy charges. Indicted for conspiring to import cocaine and marijuana in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B), (G); and conspiring to possess with the intent to distribute and distribution of cocaine and marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), Abello was convicted of both counts. He was sentenced to concurrent terms of 30 years imprisonment on each count and fined a total of $5,000,000.[1]

Abello challenges his conviction by raising the following points of error: 1) the circumstances of his extradition violate the doctrine of specialty because he was tried on a second superseding indictment which was not part of the extradition request served on the Colombian government; 2) the extensive pre-trial publicity made the

---

* Honorable John L. Kane Jr., United States Senior District Judge for the District of Colorado, sitting by designation.

1. The length of appellant's imprisonment is limited by agreement between the United States and Colombia. The Republic of Colombia has been under martial law for most of the past 30 years. Presidential Decree No. 1860 dated August 18, 1989 authorizes the extradition of Colombian nationals and defines the circumstances under which extradition may take place. Article 8(a) of Decree No. 1860 restricts the term of imprisonment for extradited Colombian nationals to no more than 30 years.

Northern District of Oklahoma an improper venue for the trial; 3) the defense was denied access to exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and 4) the prosecutor tainted the trial with inflammatory comments during closing arguments. We affirm the conviction.

The government's case against Abello portrayed him as an important figure in a jet-set cocaine clan which supplied drugs to an eager American market. Narrated by the testimony of nine co-conspirators, the government described appellant's extensive Colombian drug manufacturing and distribution operation. The most damaging testimony came from co-conspirator, Boris Olarte. In 1986, Olarte found himself in jail in the Northern District of Oklahoma. In May, 1987, unhappy in his surroundings, he agreed to cooperate with the United States Government. While in prison, Olarte orchestrated a drug transaction which involved Abello. The contact person who arranged a meeting was Olarte's common law wife, Clara Lacle.

The proposed transaction was actually an attempt to revive an earlier deal which never took place. According to Olarte, he and Abello previously met in Aruba with two other co-conspirators, Robert Jamieson and Frank Palmero, to discuss smuggling a cocaine shipment into the United States. The plan was abandoned. By May, 1987, Olarte was cooperating with the government, and he identified Abello as a target. At Olarte's suggestion, Lacle flew to Florida in June, 1987 with two FBI agents to revive the Aruba transaction. Based on these events, Abello was indicted, extradited and convicted of participating in a drug importation and distribution conspiracy.

## I. *Extradition and the Doctrine of Specialty.*

Abello was extradited to the United States in October, 1989 under a superseding indictment. The indictment charged him with two counts: 1) conspiracy to import schedule I and II controlled substances; and 2) conspiracy to possess with intent to distribute marijuana and cocaine.

The request for extradition was presented to the Colombian Ministry of Foreign Relation by the United States Embassy in Bogota on October 20, 1989. The request contained a reference to an October 7, 1987 superseding indictment from the Northern District of Oklahoma. Copies of the arrest warrant and superseding indictment were included. Under the heading of "Overt Acts," the indictment contains lengthy discussion of the drug conspiracy but only a brief mention of Abello. Included in the extradition request itself, however, was the following narration of facts.

> The facts of the case indicate that in 1986 and 1987, Abello–Silva actively participated in the planning of a shipment of 500 kilograms of cocaine into the United States from Colombia. The proposed shipment was planned by Abello–Silva and his associates at meetings in both Colombia and Aruba, but was ultimately abandoned because of difficulties in communication among the co-conspirators.

Vol. 3, Doc. 244, Exhibit F.

A second superseding indictment was obtained after Abello was extradited to the United States. The second superseding indictment, returned by the grand jury on January 3, 1990, charged Abello with the identical two offenses set out in the first superseding indictment. Added, however, were more facts detailing Abello's illegal activities. While the first superseding indictment was directed at several alleged co-conspirators and a plethora of criminal activity, the second indictment was directed only at Abello and focused on his particular role in the conspiracy.

The second superseding indictment linked Abello with members of the "Medellin" and "Cali" drug cartels and drug kingpins like Pablo Escobar–Gaviria, Jose Gonzalo Rodriguez–Gacha and Jorge Ochoa–Vasquez. The new indictment expanded on the scope of Abello's drug smuggling activities and detailed the mechanics of his cocaine and marijuana smuggling operation.

▮ Abello alleges the second superseding indictment violates the "doctrine of specialty." After extradition was complete, Abello was tried under an indictment con-

taining broader allegations of facts than the indictment on which his extradition was based. The government responds it prosecuted Abello for the identical crimes contained in both indictments. According to the government, the doctrine of specialty is about parallel *offenses* and not parallel *facts* in an indictment. Further, raising the doctrine is within the province of the asylum country and the asylum country must itself object. The District Court, in a March 7, 1990 order, ruled in favor of the government. Since the issue involves a legal dispute about the specialty doctrine, our review is *de novo*. *Quinn v. Robinson*, 783 F.2d 776, 791–92 (9th Cir.1986), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

Abello refers to several diplomatic communications which purportedly register Colombia's objection to prosecuting Abello on the second superseding indictment. The government argues the diplomatic notes merely relay concerns expressed by defense counsel and not the official position of the Republic of Colombia. This distinction is important, the government argues, because the asylum state is the party with standing to raise the specialty issue. We conclude the dispute over who raised the objection is irrelevant. Although there is disagreement whether a criminal defendant may raise the specialty doctrine in his own right,[2] we recently held in *United States v. Levy*, 905 F.2d 326, 328 n. 1 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 759, 112 L.Ed.2d 778 (1991) that a criminal defendant may raise the issue himself.

■ The diplomatic communications serve a second purpose in Abello's argument. He asserts any legal dispute over emphasis on "facts" or "offenses" in applying the specialty doctrine is resolved by the laws of the asylum country: Colombia in this case. He argues the second superseding indictment charges him with additional wrongdoing which constitutes a separate matter; whether a new, separate matter was added is for Colombia to decide.

Abello cites *United States v. Paroutian*, 299 F.2d 486, 490–91 (2nd Cir.1962): "So the test whether trial is for a 'separate offense' should be not some technical refinement of local law, but whether the extraditing country [Colombia] would consider the offense actually tried 'separate.'" Attempting to show Colombian law focuses on the particular "deeds" of the accused and would scrutinize the "facts" presented in the extradition request, Abello cites Articles 650 and 651 of the Colombian Code of Criminal Procedure (1987).

■ Abello, however, fails to support his claim that Colombian law controls the dispute. We perceive only two situations where Colombian law is relevant. First, precedent in this country directs that the asylum country's law defines the doctrine of specialty. Second, the United States, by treaty, agrees to be bound by foreign law. We find neither. The quoted passage from *Paroutian* refers to the court's deference to the asylum country's interest in protecting its residents. It is not a statement about international choice of laws. As a creature of international law, the specialty doctrine forbids the requesting country from prosecuting an extradited defendant for more than it set out in its extradition request. "The doctrine of 'specialty' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering country agreed to extradite." *United States v. Cuevas*, 847 F.2d 1417, 1426 (9th Cir.1988). *See also Quinn v. Robinson*, 783 F.2d at 782; *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886).

■ The *Paroutian* court recognized the asylum country's desire to extradite

---

**2.** Traditionally, the doctrine of specialty was a privilege of the asylum state designed to protect its "dignity and interests, rather than a right accruing to the accused." *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir.1973). *See generally* Restatement (Third of Foreign Relations Law of the United States § 477, comment b,

(1987)); *accord Demjanjuk v. Petrovsky*, 776 F.2d 571, 583–84 (6th Cir.1985), *cert. denied* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). *Contra: United States v. Cuevas*, 847 F.2d 1417 (9th Cir.1988), *cert. denied* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989).

only those individuals against whom a substantial case lies. A reviewing court places itself in the position of the asylum country and inquires whether the asylum state would consent to the extradition. In other words, we examine whether there is sufficient evidence in the request for extradition to grant the request. If the accused is tried for a matter different from the one mentioned in the request, the requesting country has not satisfied the concerns of the asylum state. The asylum state, therefore, would refuse the extradition request because it was not presented with the case against its resident and had no opportunity to scrutinize the extradition request. In *Paroutian*, the court believed the asylum state, once fully apprised of the facts, would conclude the accused stood trial only for those offenses for which he was extradited. The deference to the asylum state in *Paroutian* cannot be construed to mean the asylum state's jurisprudence governs the specialty doctrine as applied in the United States.

 As for consenting to be bound by foreign law, we recognize that extradition exists only by agreement between states. Restatement (Third) of Foreign Relations Law of the United States § 475, comment b (1987). Hence, the extradition of individuals occurs subject to any limitation either country imposes. *Cuevas*, 847 F.2d at 1427. The limitations which appear in Decree No. 1860 are few. The accused must not be sentenced to more than thirty years and the death penalty may not be sought. The only provision of the Colombian Code of Criminal Procedure mandated in the Decree is a reference to Article 660. Article 660, however, deals with individuals who committed an earlier offense in Colombia and are later sought for extradition on another matter. The article states the accused must first complete his sentence in Colombia before extradition takes place.

 Unless otherwise directed by treaty or statute, we will look to United States precedent to understand and apply the specialty doctrine. The bulk of authority describes the doctrine in terms of parallel offenses and not parallel facts. For exam-

ple, Abello's own reference to *Paroutian* belies his contention that the specialty doctrine is about additional facts and not offenses, "the test is whether the trial is for a 'separate *offense.*'" *Paroutian*, 299 F.2d at 491. (emphasis added). In *Levy* we did not address the "facts" versus "offenses" distinction. Instead, *Levy* discussed the specialty doctrine in terms of parallel "charges," *Levy*, 905 F.2d at 328. "Charges" is akin to "offenses." Hence, we conclude the relevant inquiry is the nature of the offenses in the two indictments and not the different "facts" alleged in support of the offenses.

 Abello's argument implies the extradition request must be the definitive document in a government's case against the accused. This is not so. The specialty doctrine specifically recognizes the possibility, for strategic reasons, that the evidence introduced at trial was withheld from the extradition request. "Thus, there is no right to object at trial to the introduction of evidence that was not part of the request for extradition, so long as the evidence is directed to the charge contained in the request for extradition." Restatement (Third) of Foreign Relations Law of the United States § 477, comment c (1987). The specialty principle is not a vehicle for discovery.

Those cases cited by Abello which scrutinize the "facts" underpinning the request for extradition are distinguishable. Abello cites *United States v. Sensi*, 879 F.2d 888 (D.C.Cir.1989), and the importance the court places on the "established facts" and "evidentiary material." *Id.* at 895–96. Read in its entirety, *Sensi* informs the doctrine of specialty to "requir[e] a correspondence between the charges contained in the indictment and the facts presented to the [asylum country's] magistrate." *Sensi*, 879 F.2d at 895. In Abello's case, the "charges" in the request for extradition are the same as those for which he stood trial. Hence, he hopes for mileage from the "facts presented" language in *Sensi*. The reference to facts, however, stems from the extradition treaty between the

United States and Britain; Britain was the asylum country in *Sensi*.[3]

Responding to this treaty language, *Sensi* applies a two part test. First, the charge must be an extraditable offense. Second, the charges must be established by sufficient "evidentiary material" presented to the magistrate in the asylum country. In this case, however, Abello never alleges drug trafficking is not an extraditable offense. The second prong of the test in *Sensi* requires the requesting country to present the asylum country with sufficient facts to grant the extradition request.

In this case, the "established by the facts language" does not appear in Decree No. 1860. Regardless, nothing in the briefs indicates Abello is arguing there were insufficient facts to support the request for extradition. The absence of such a claim exposes a larger fallacy beneath Abello's entire extradition argument. He points to the scant references to himself in the first superseding indictment. The Colombia government, nonetheless, found sufficient justification to extradite him on these facts.

■ The second superseding indictment contained a great deal of incriminating information about Abello. The crux of the doctrine of specialty is the question: "whether the requested state has objected or would object to prosecution," Restatement (Third) of Foreign Relations Law of the United States § 477, comment b (1987). If the Colombian government was satisfied by the first indictment and granted the extradition request, it would not object to prosecution for the same offenses under the second indictment when the second indictment presented an even stronger case. There is, of course, nothing in either instance touching upon the dignity, security or sovereignty of that government itself which might give rise to diplomatic considerations.

Abello's reference to *Caplan v. Vokes*, 649 F.2d 1336 (9th Cir.1981), makes the same mistake as his reference to *Sensi*. *Caplan* speaks about "offenses." ("The principle of specialty mandates a careful culling of extraditable offenses from non-extraditable offenses," *Caplan*, 649 F.2d at 1343). The references to "facts" are in the context of the "established by the facts ..." language in an extradition treaty similar to the one in *Sensi*. Because there is no such treaty in the present case, *Caplan* must be distinguished.

Abello refers to the court's emphasis on the "acts" alleged in the extradition request in *United States v. Cuevas*, 847 F.2d at 1428. This, too, is explained by the presence of treaty language which controls extradition. *Cuevas* states the specialty doctrine is specifically about parallel "offenses." *Id.* at 1426. We acknowledge the *Cuevas* court's discussion about the specific acts by the accused. The reason for this discussion is a limitation in the extradition treaty between the United States and Switzerland. According to that treaty, the requesting country is enjoined from prosecuting the extradited individual for the "fiscal aspects" of the crime, *id.* at 1426–27.

Since the requesting country must honor the limitations imposed by the asylum country, the *Cuevas* court struggled with the ambiguous term, "fiscal aspects." To understand the term, the court considered the specific "acts" performed by the defendant to determine whether the defendant could be prosecuted. The inquiry into the acts alleged in the request for extradition was for the purpose of understanding a term in the extradition treaty. Since no such ambiguous term appears in the Colombian Decree, there is no need to focus on the specific acts alleged in the extradition request and second superseding indictment.

■ Thus, we conclude the doctrine of specialty requires the defendant be tried only for those offenses which appear in the extradition request. The extradition doc-

---

**3.** The relevant section from the treaty provides:
(1) A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense *established by the facts in*

*respect of which his extradition has been granted* ....
Extradition Treaty, June 8, 1972, United States–United Kingdom, art. XII(1) 28 U.S.T. 227, 233 T.I.A.S. No. 846B (emphasis added).

ument describes two offenses. The first count mentioned in the extradition request states Abello conspired to import cocaine into the United States. The first superseding indictment attached to the extradition request alleges violations of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B), (G), and 963; these sections concern the importation and conspiracy to import controlled substances into the United States. Count one of the second superseding indictment charges Abello with committing the same offenses and lists the identical code sections.

Likewise, the second offense alleged in the extradition request mirrors the offense set out in the second superseding indictment. In the extradition document, Abello is charged with conspiring to distribute cocaine. The first superseding indictment alleges violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), (vii), and 846; these sections deal with the manufacture and distribution of controlled substances in the United States. Count two of the second superseding indictment also charges Abello with the same offenses and refers to the identical code sections. Because both counts of the second superseding indictment charge Abello with the same offenses as are mentioned in the extradition request, we find no violation of the specialty doctrine.

## II. *Transfer of Venue.*

■ Abello's second argument is the district court abused its discretion in denying his motion for a change of venue. Abello states the jury was prejudiced by pre-trial publicity. Prejudice may be presumed, he argues, because of the national attention on drug trafficking and the unethical conduct of the prosecution. Alternatively, he asserts that if prejudice is not presumed, the totality of the circumstances demonstrates actual prejudice. Since the decision to transfer venue is within the trial court's discretion, we review for an abuse of discretion. *United States v. Neal*, 718 F.2d 1505, 1510 (10th Cir.1983), *cert. denied*, 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 34 (1984).

Under F.R.Crim.P. 21(a), the court shall transfer venue if there exists "so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." The Constitution guarantees the defendant "a fair trial by a panel of impartial, 'indifferent' jurors". *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). The trial must be held in a tribunal "free of prejudice, passion, excitement, and tyrannical power." *Sheppard v. Maxwell*, 384 U.S. 333, 350, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966).

Evaluating the effect of pre-trial publicity, however, is best accomplished by the trial judge. Hence, a reviewing court must "give great deference to the trial court's discretion." *United States v. Tokoph*, 514 F.2d 597, 606 (10th Cir.1975). *See also United States v. Smaldone*, 485 F.2d 1333, 1345 (10th Cir.1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). Further, the trial court's decision is "entitled to a presumption of correctness and will not be overturned unless there is manifest error." *United States v. Affleck*, 776 F.2d 1451, 1454 (10th Cir.1985).

■ Abello's first venue argument is that pre-trial publicity was so inflammatory that prejudice may be presumed, and a change of venue is required as a matter of law. He argues overwhelming publicity coupled with the release of prejudicial information by the prosecution supports the presumption of prejudice. It is his burden to establish the presumption of prejudice. *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). Abello, however, has not established an irrepressibly hostile attitude pervaded the community as the case law requires.

■ Pre-trial publicity in topical criminal cases is inevitable. The publicity impacts defendant's rights only when it dictates the community's opinion as to guilt or innocence. *Estes v. Texas*, 381 U.S. 532, 536, 85 S.Ct. 1628, 1629, 14 L.Ed.2d 543 (1965). In rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a

matter of law. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In cases like *Estes, Rideau* and *Sheppard*, prejudice was presumed because the news media influence "pervaded the proceedings," igniting extensive prejudice in the community. *Murphy*, 421 U.S. at 798–99, 95 S.Ct. at 2035 (1975).

A review of the pre-trial publicity distinguishes this case from the situations in *Estes, Rideau* and *Sheppard*. In *Estes,* the trial was tainted by massive pre-trial publicity which totaled 11 volumes of press clippings. In addition, initial pre-trial hearings and portions of the trial were televised to the entire community. *Estes*, 381 U.S. at 536, 85 S.Ct. at 1629. In *Rideau*, due process was compromised because the defendant's confession to the sheriff was filmed and televised on the local news. *Rideau*, 373 U.S. at 727, 83 S.Ct. at 1419–20. In *Sheppard*, pre-trial publicity filled 5 volumes of news clippings in a six month period. Reporters were given space next to the jury room and newspapers published the names and addresses of potential jurors. The jurors were peppered with letters and telephone calls regarding the upcoming trial. *Sheppard*, 384 U.S. at 342–43, 86 S.Ct. at 1512.

In contrast, pre-trial publicity in this case consisted of 31 articles over a six month period; the articles appeared an average of five per month. There was no media circus as in the other cases. The jurors were anonymously selected and their identities protected. The news clippings themselves reveal mostly statements of fact gathered from public records and from pre-trial hearings. Despite accusations to the contrary, Abello points to nothing in the record indicating prosecutorial misconduct in the dissemination of pretrial information.

■ We conclude presumed prejudice is rarely invoked and only in extreme situations. *See Nebraska Press Association v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976); *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986,

68 L.Ed.2d 303 (1981). Here, adverse publicity existed, but it "did not permeate the community to such a degree that empaneling a fair jury would have been impossible". *United States v. Affleck*, 776 F.2d at 1454. Therefore, no presumption of prejudice is found.

■ Alternatively, Abello contends even if prejudice is not presumed, actual prejudice tainted his trial. Actual prejudice is shown by examining the totality of the circumstances.

> Due process requires that the accused receive a fair trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances.

*Sheppard*, 384 U.S. at 362, 86 S.Ct. at 1522.

Abello asserts massive pre-trial publicity was directed at him and not an event. This magnifies the effect of the publicity. As a result, every member of the venire had heard of Abello and his alleged crimes. The general questions to the jury panel during *voir dire*, Abello argues, were insufficient to dispel their pre-disposition toward him. Our review of the pretrial publicity and *voir dire* fails to divulge actual prejudice sufficient to suggest the trial judge's decision constituted an abuse of discretion.

■ The trial court has broad discretion in "gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial." *United States v. McDonald*, 576 F.2d 1350, 1354 (9th Cir.1978), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978). The "proper occasion for determining juror partiality is upon *voir dire* examination." *United States v. Lamb*, 575 F.2d 1310, 1315 (10th Cir.1978), *cert. denied*, 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978). In our own review of the *voir dire*, we must determine "whether

the judge had a reasonable basis for concluding the jurors selected could be impartial." *United States v. Hueftle,* 687 F.2d 1305, 1310 (10th Cir.1982). Impartiality does not mean jurors are totally ignorant of the case. Indeed, it is difficult to imagine how an intelligent venireman could be completely uninformed of significant events in his community. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643; *see also Murphy,* 421 U.S. at 799–800, 95 S.Ct. at 2036.

▇▇ Abello asserts the trial judge erred by asking only general questions of the jurors. Since all admitted having prior knowledge of the case, he urges, the questions the judge asked were insufficient. Abello points out the *voir dire* lasted only 6 hours. Time, of course, is utterly irrelevant to sufficiency or adequacy. On the contrary an unreasonable expenditure of time in *voir dire* examination could suggest confusion, not completeness. Relying on *Silverthorne v. United States,* 400 F.2d 627 (9th Cir.1968), he argues the judge did not "adequately dispel the probability of prejudice." This argument fails for two reasons.

First, the *Silverthorne* holding requires the trial court to conduct extensive *voir dire* questioning of each individual juror in cases where all jurors have prior knowledge of the case and there is voluminous, inflammatory pre-trial publicity. "Voluminous" publicity in *Silverthorne* amounted to over 300 articles published before jury selection. The defendant in *Silverthorne* was the president of a failed San Francisco bank and well known to the community. In this case, Abello proffers only 31 articles published over a six month period. There was "no massive, inflammatory publicity creat[ing] a hostile climate requiring extremely close scrutiny of jurors." *United States v. Hall,* 536 F.2d 313, 326 (10th Cir.1976), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976).

Second, the trial judge, cognizant of the pre-trial prejudice, took adequate measures during *voir dire* to insure jury impartiality. At Abello's request, the trial judge asked questions incorporating six specific topics in several questions directed at each potential juror. Abello himself proposed the areas of inquiry and the trial judge accepted six of seven topics proposed. Also at Abello's request, the court submitted to the venire an extensive written questionnaire prepared with the help of the defense. The judge excused all veniremen showing bias and questioned remaining jurors specifically about pretrial publicity and their ability to be fair and impartial.

We believe the trial court adequately dispelled the possibility of prejudice through *voir dire.* Pretrial publicity was not overwhelming. Detailed areas of inquiry, suggested by the defendant, were incorporated into *voir dire.* While all veniremen had heard of Abello, this fact alone does not warrant reversal. Potential jurors with pre-formed opinions were excused while remaining jurors repeatedly affirmed they could be fair and impartial. The court assured itself each juror "would decide impartially the case on the basis of what he or she heard in the courtroom, and not what he or she read in the paper or heard on TV." *United States v. Cattle King Packing Co.,* 793 F.2d 232, 236 (10th Cir. 1986) *cert. denied,* 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986).

The present case is distinguishable from those cases where prejudice was presumed. Considering the totality of the circumstances, we believe actual prejudice was not established. We conclude the trial judge did not abuse his discretion when he denied Abello's transfer of venue motion.

### III. *Brady Material.*

▇▇ At trial, Abello attempted to call Tulsa Deputy Sheriff Tony Boutwell during his case-in-chief. Boutwell was called to testify that Olarte, the government's star witness, was charged with possessing marijuana while incarcerated in a Tulsa jail in 1988. In May, 1989, this state felony charge was dismissed in light of Olarte's cooperation with federal authorities. In preparation for trial, Abello filed motions

on January 29, and February 2, 1990, requesting the disclosure of all benefits conferred upon prosecution witnesses. Dismissal of Olarte's state marijuana charge was not disclosed by the prosecution.

Abello argues this omission by the government is reversible error. Knowledge of Olarte's felony marijuana charge in state court is important impeachment evidence. According to Abello, the prosecutor helped arrange for the charges to be dropped. This indebtedness to the government casts doubt on the credibility of Olarte. Since Olarte was crucial to the government's case, Abello claims the evidence was useful to impeach Olarte's testimony as biased in favor of the government.

The government points to a lengthy hearing conducted by the trial judge who concluded the defense knew of the evidence before trial. Regardless, it claims the proffered testimony was properly refused because it was impeachment evidence which may not be proven by extrinsic means. The government also argues the evidence was insignificant given the array of other impeachment evidence presented against Olarte by the Abello. Finally, the government points out that Olarte began cooperating with the government in May of 1987, well before the marijuana charge arose. Hence, the incremental benefit to Olarte from the marijuana dismissal was insignificant for impeachment purposes in light of the multiple federal narcotics trafficking charges he faced.

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97 (1963), the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *See Bowen v. Maynard*, 799 F.2d 593, 602 (10th Cir.1986), *cert. denied*, 479 U.S. 962, 107

S.Ct. 458, 93 L.Ed.2d 404 (1986). This widely cited passage establishes the prosecutor's broad duty to disclose exculpatory evidence to the defense. The prosecutor's duty is based on the requirements of due process. The defendant's right to due process is violated when material evidence is suppressed thus undermining confidence in the outcome of the trial.

For evidence to fall under the rule in *Brady*, it must be both exculpatory and material, *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. The impeachment evidence here at issue is exculpatory. This court has stated, "Impeachment evidence merits the same constitutional treatment as exculpatory evidence." *Bowen*, 799 F.2d at 610; *see Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

The gravamen of the dispute is materiality.[4] If the evidence sought to impeach Olarte did not materially affect the ultimate outcome, there is no reversible error. As the Court held in *United States v. Bagley*, 473 U.S. 667, 676 n. 7, 105 S.Ct. 3375, 3380 n. 7, 87 L.Ed.2d 481 (1985), "Furthermore, a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." Hence, materiality is the key to understanding the application of *Brady*.

■■■ The *Brady* issue in this case is a mixed question of law and fact. "The materiality of withheld evidence under *Brady* and its possible effect on the verdict are mixed questions of fact and law reviewed *de novo.*" *United States v. Buchanan*, 891 F.2d 1436, 1440 (10th Cir.1989), *cert. denied*, 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990); *see also Bowen v. Maynard*, 799 F.2d 593, 610 (10th Cir.1986), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458

---

4. The parties dispute when and whether the defense knew Olarte's state marijuana conviction was dismissed. The defense claims it learned of the dismissal during trial but after it could effectively use the evidence in its cross-examination through extrinsic evidence in its case-in-chief. *See* Fed.R.Evid. 608(b).

The trial court specifically found that the defense knew of the marijuana charge before trial. We express no opinion on this finding, nor do we rule on the Rule 608(b) evidentiary issue. We believe the materiality of issues resolves the *Brady* problem.

(1986). We review *de novo* the trial court's decision the evidence was not material.

■■■■■ The standard of materiality required to set aside a criminal conviction for violating *Brady* depends on the specificity of the defendant's request and the prosecutor's conduct. The Supreme Court in *United States v. Agurs*, 427 U.S. 97, 103–107, 96 S.Ct. 2392, 2397–99, 49 L.Ed.2d 342 (1976), described three different materiality standards corresponding to several situations where *Brady* problems arise. It is clear from the record at trial that the defense made a specific pretrial request for any benefit or consideration bestowed on a government witness.[5] Our conclusion is buttressed by the Court's conclusion in *United States v. Bagley*, 473 U.S. at 669–70, 105 S.Ct. at 3377, that a request for "any deals, promises or inducements made to witnesses in exchange for their testimony" is considered specific under *Agurs*. Hence, we apply the second *Agurs* materiality standard.[6]

Under this standard, a *Brady* violation is established upon a showing that "suppressed evidence might have affected the outcome of the trial." *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2398; *United States v. Buchanan*, 891 F.2d at 1441. This relatively low materiality standard exists because of the relative position of the parties. The government's hand is stacked with cards the defense lacks. It can immunize witnesses and gather information beyond the reach of the defendant. With this power comes the government's responsibility to use it fairly.

In *United States v. Bagley*, the Supreme Court further discussed the three *Agurs* materiality standards. Like this case, *Bagley* dealt with impeachment evidence useful to the defense but not disclosed by the prosecutor even after a specific request was made by the defense. On the issue of the materiality, the Court held, "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

Since the appellant in this case made a specific request upon the government for aid rendered on Olarte's behalf, *Bagley* permits us to consider carefully any specific difficulties in the presentation or timing of the appellant's defense. While we continue to apply the "reasonable probability" language,

> The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had

---

**5.** In his February 2, 1990 motion, defendant requested from the government,

> Any and all consideration or promise of consideration given to or on behalf of each witness or expected or hoped for by the witness. By "consideration" Defendant refers to absolutely everything, whether bargained for or not, which arguably could be of value or use to a witness ... including, but not limited to, formal or informal, direct or indirect: immunity, leniency, favorable treatment or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, tax court, court of claims administrative or other dispute with Government or with any other parties. ...

Vol. 1, Doc. 241 at 2.

**6.** We acknowledge that many subsequent cases construing *Brady* deal with exculpatory evidence uncovered after the trial has ended. Here, the defense knew of the evidence at least midway through the trial. (Defense contends they learned of the evidence after it could be effectively utilized.)

The materiality standard, however, is the same whether the defense learned during or after trial.

> The [Brady] problem arises in two principle contexts. First, in advance of trial, and perhaps during the course of trial as well, the prosecutor must decide what, if anything, he should voluntarily submit to defense counsel. Second, after trial a judge may be required to decide whether a nondisclosure deprived the defendant of his right to due process. Logically, the same standard must apply at both times.

*Agurs*, 427 U.S. at 107–08, 96 S.Ct. at 2399.

the defense not been mislead by the prosecutor's incomplete response.

*Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384.

As generously as *Brady* tries to treat defendants who make specific requests of the government, we cannot conclude the evidence at issue would have changed the outcome of the trial with any "reasonable probability." The prosecutor's case revolved around the jury's belief in Olarte as a witness. Abello's defense required that Olarte be discredited. Both were accomplished. Olarte provided the link between Abello and drug trafficking in the Northern District of Oklahoma. If the jury believed Olarte and his incriminating testimony, they would convict Abello.

Olarte testified for three days. During his testimony, the twenty-seven year old Olarte admitted on direct examination to pleading guilty to five felonies. The felonies stem from his role in marijuana and cocaine importation and distribution conspiracies. The penalties for these convictions totaled two life imprisonment sentences and fines of ten and a half million dollars. In exchange for pleading guilty to these offenses and for cooperating as a government witness, Olarte received a sentence of only ten years. In addition, the government agreed to dismiss other drug-related charges like those related to membership in a continuing criminal enterprise against him and his wife. Finally, Olarte disclosed he filed a motion under F.R.Crim. P. 35(b) requesting a sentence reduction in light of his continued cooperation.

The exposure of Olarte's felony convictions and extensive criminal involvement in the drug trade during the early 1980s creates two lasting impressions upon the jury. First, Olarte is a celebrated criminal whose character is suspect; second, Olarte is indebted to the government and continues to benefit from testifying against former co-conspirators. In his cross-examination of the witness, Abello expanded on these two themes to impeach the witness' credibility in the eyes of the jury. At defense counsel's suggestion, Olarte repeatedly admitted he was testifying to avoid spending time in jail. Olarte admitted he had lied in previous trial appearances for his own benefit. Defense counsel used transcripts from Olarte's previous testimony to expose inconsistencies in his present testimony on numerous subjects. These inconsistencies included important details about the timing of his Aruba meeting with Abello.

Cross-examination by defense counsel exposed a host of other illegal activities undertaken by Olarte in order to facilitate his narcotics trafficking operation. One line of questioning, particularly relevant to the state marijuana dismissal, was Olarte's disclosure that he paid a fellow inmate $20,000 to help him break out of the Tulsa county jail. The plan included a helicopter airlift from the jail yard while hired mercenaries kept the guards at bay.

The record is replete with impeachment evidence against Olarte. It is possible, as the court theorized in *Barkauskas v. Lane,* 878 F.2d 1031, 1034 (7th Cir.1989), that learning of the state marijuana dismissal could have "pushed the jury over the edge into the region of reasonable doubt." We are not persuaded. The Supreme Court articulated a materiality test which permits reversal when the outcome of the trial is affected. Although Abello made a specific request for benefits conferred upon government witnesses, we conclude there is no "reasonable probability" the jury would have returned a different verdict had it known about the additional impeachment evidence. We conclude the evidence was not material under *Brady* and its progeny.

## IV. *Prosecutor's Closing Argument.*

### A. *Appeal to Ethnicity.*

■ Pointing to portions of the prosecutor's closing statement, Abello argues the government made several references to his Colombian nationality. Nationality or ethnicity, according to Abello, was a theme running through the prosecutor's closing argument. For example, the prosecutor stated Abello, "secure in the comfort of Colombian corruption ... laughs at American justice." Vol. 57 at 7838–39. At the end of his statement, the prosecutor triumphantly declared, Abello is the "biggest

1182

fish landed by the United States out of that Colombian sea of narcotics. Don't let him go." Vol. 57 at 7877.

This appeal to ethnicity or nationality, Abello argues, is inflammatory and prejudicial; it denies the accused his right to a fair trial. Abello, however, did not object to these statements at trial. Hence, we review for "plain error" affecting substantial rights of the accused. F.R.Crim.Pro. 52(b); see United States v. Young, 470 U.S. 1, 14, 105 S.Ct. 1038, 1045–46, 84 L.Ed.2d 1 (1985).

Abello argues the prosecutor committed error in two ways. First, by stressing Abello's Colombian nationality, the prosecutor improperly appealed to the patriotism of the jury. Second, the prosecutor took advantage of the "war on drugs" hysteria flickering through the headlines of the nation's newspapers.

Abello relies on United States v. Doe, 903 F.2d 16 (D.C.Cir.1990). There, the court reversed the trial court's conviction of defendants on drug and firearm charges. The court found reversible error in the prosecutor's closing argument. In his argument, the prosecutor repeatedly referred to "Jamaicans" taking over the crack cocaine trade in Washington, D.C.. The prosecutor described a city under siege with Jamaican drug pushers taking over apartments and intimidating residents with guns and violence.

This improper reference to the ethnicity of the defendants, according to the court, was not harmless beyond a reasonable doubt; the prosecutor was appealing to latent prejudice against black Jamaicans. The court then summarized the evidence on which the defendants were convicted. The court concluded the evidence, in several important areas, was weak. The court also rejected the government's claim that it was merely repeating the testimony of a government witness; that witnesses' testimony had been discredited by the court. Because of these shortcomings in the government's case, the court believed there was an opportunity for the prosecutor's inflammatory closing remarks to infect the jury's deliberation.

In this case, the evidence against Abello was abundant. There is plenty of testimony which supports the government's declaration that corruption in Colombia allowed drug trafficking to flourish and drug traffickers to live lavish lives. Nowhere does Abello argue that the evidence against him was lacking such that rhetoric and race took the place of substantive evidence in the jury's mind. We have stated that appellate review of the prosecutor's comments during argument at trial must occur in the context of the entire record. United States v. Washita Const. Co., 789 F.2d 809, 822 (10th Cir.1986).

In this case, closing argument occurred over several hours and summarized a trial lasting several weeks. Focussing on a handful of statements by the prosecutor misconstrues his entire presentation. Having read both closing arguments in their entirety, we conclude ethnicity or nationality was not used to manipulate the prejudices of the jury. The specific statements cited by Abello were supported by the testimony of several witnesses. Judged in its entirety, we cannot conclude the prosecutor's reference to the defendant's Colombian nationality deprived him of a fair trial.

B. *Prosecutor Expressed Personal Opinions.*

■ During the rebuttal portion of the government's closing argument, the prosecutor made the following statement.

The defendant tells you please take my word for it, please disbelieve 23 liars that the government has gotten together and conspired and told to lie, made up the lie, convinced them to lie. Ladies and gentlemen, I'm not that good. I'm not that motivated. I wouldn't do that, to ask people to come into this courtroom—[objection] to get people to get on that witness stand.

Vol. 57 at 7949–50. According to Abello, the prosecutor injected himself and the integrity of his position into the jury's consideration. By stating he would not manufacture false testimony, he indirectly vouches for the credibility of the government witnesses. The statement also implies the

prosecutor knew of additional evidence, not known to the jury, which further enhances the credibility of government witnesses.

We reach a different conclusion. The statement came on the heels of the appellant's own closing argument. In that argument, defense counsel argued Abello was himself a victim of a conspiracy created by the government. The government manufactured an alleged drug conspiracy through perjured testimony. When Abello himself testified, he accused every government witness of lying. His counsel in his closing remarks charged the prosecution with assembling a massive fraud on the court.

> Now, I submit to you, people, that the testimony of people like [witness] being sponsored by this government is graphic and audible testimony to the desperation of the government to try and make this case come alive against [Abello] by having this huge chart and all these other accusations ... Now people, I submit to you that the evidence shows that the assertions by Olarte and Lacle that there was a conspiracy involving [Abello] with them in Aruba is built on sand, it's false, it cannot stand the scrutiny ... on their black, untrusting and untruthful souls it's exposed for what it is. It's a lie and it's a lie that they've sold to the United States of America.

Vol. 57 at 7911–12. Abello also implied he was targeted by the prosecution because of the notoriety the prosecutors would obtain from the trial.

Attacking the credibility of government witnesses and the foundation of the government's case is legitimate. There is also nothing improper with attacking the motivation of the prosecutor. These arguments, however, invite rebuttal from the prosecution. We recognize that "considerable latitude is given the prosecutor in replying to an argument raised by defense counsel's closing statement." *Washita,* 789 F.2d at 823. *See United States v. Dickey,* 736 F.2d 571, 596 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). The prosecutor in this case could have more artfully rebutted the charge that he orchestrated a parade of

liars to the witness stand. He had the right, however, to deny he supplied untruthful witnesses; he also had the right to defend the integrity of his position.

### C. *Appearance of FBI Agent Weber.*

In his opening statement, defense counsel told the jury special agent Martin Weber would testify. The government objected claiming it did not intend to call Weber. In response, defense counsel stated he would call Weber. Weber was the FBI case agent responsible for assembling the evidence against Abello. During the trial, the defense tried to call Weber as a witness. Defense counsel tried several times to subpoena Weber and filed affidavits in support of the subpoena. The trial court concluded Weber could provide no relevant, admissible testimony on any of the subjects mentioned in the affidavits and quashed the subpoenas. Abello does not challenge the trial court's decision on this matter.

Abello does object, however, to the prosecutor's reference to defense counsel's failure to call Weber as a witness as promised. In the rebuttal portion of his closing argument, the prosecutor stated, "In [defense counsel's] opening statement he told you that Mr. Marty Weber will be up here to testify. He had the right to call Weber to testify—[objection]...." Vol. 57, at 7957. Abello argues this reference to Weber's absence was an improper reference to evidence not in the record which invited the jury to reach a conclusion unfavorable to him.

We find no error. Defense counsel referred to Weber in his opening statement. The prosecutor's reference to Weber's absence and Abello's right to call him as a witness was proper. Factually, it is true that Abello had the right to call Weber provided Weber could contribute admissible evidence. By inference, nothing in the prosecutor's comments suggest an ulterior motive or that Abello was hiding from Weber's testimony.

Conversely, the party drawing conclusions from Weber's absence was Abello.

**1184**

The defense's suggestion was that Weber was at the controls of a government conspiracy to trap Abello. The prosecutor had the right to respond to the cloud cast on Weber's role in the investigation. It did so without any negative implications about Abello's failure to produce Weber as a witness.

## V. *Conclusion.*

Finding no reversible error, the district court's verdict is AFFIRMED.