THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD BARKAUSKAS, Defendant-Appellant.

First District (1st Division)   No. 83—0883

Opinion filed August 25, 1986.

362

Steven Clark and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Patrick J. Foley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Edward Barkauskas was convicted of the murder of his wife (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)) and armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2), so-

licitation (Ill. Rev. Stat. 1979, ch. 38, par. 8—1(a)), and conspiracy (Ill. Rev. Stat. 1979, ch. 38, par. 8—2(a)), in connection with that murder. The judgments on armed violence, solicitation, and conspiracy were vacated, and the trial court sentenced defendant to natural life in prison for murder. Defendant appeals, contending that: (1) the prosecution failed to comply with rules of discovery; (2) the prosecution failed to prove him guilty beyond a reasonable doubt; (3) prosecutorial misconduct deprived him of a fair trial; (4) the trial court erred in conducting an *in camera* inspection of a witness' mental-health records outside the presence of counsel; (5) he received inadequate legal representation at trial; (6) the trial court erred in refusing to tender certain instructions to the jury; and (7) his natural-life sentence is excessive. For the following reasons, we affirm.

The record reflects that a few weeks prior to the homicide, defendant approached James Galason at a hot dog stand on 43rd and Rockwell in Chicago and asked him if he was "crazy enough" to kill defendant's wife Joanne. Galason testified that he agreed to do it in exchange for the remainder of insurance money after the victim's funeral expenses were paid. Galason further testified that three days after his initial meeting with defendant, he was walking down the block with his roommates Ken and Joe Beringer when Ken pulled out a picture of defendant's wife and remarked, "We'll see who gets her first." Galason also stated that about two Tuesdays before the homicide, the defendant came to his apartment and implored him to kill his wife soon because she wanted to see a lawyer about a divorce. The defendant asked Galason to shoot her below the neck so there could be an "open coffin wake."

The next time Galason saw the defendant was at 11 p.m. on June 15, 1981, the night before the shooting. Galason, who was seated on the porch at the Chiquet residence at 43rd and Artesian, flagged down the defendant who was driving down the street. The defendant gave Galason a ride home. Galason testified that while in the car, the defendant told him that he had the murder planned for the following day because his wife would be walking on 42nd and Artesian to the bus stop and he would be driving to Skokie on business and would therefore have a good alibi. Galason further testified that the defendant told him to say it was a robbery if he got caught since his wife usually carried a lot of money and wore expensive jewelry.

At approximately 4:30 a.m. on July 16, 1981, Joe and Ken Beringer woke Galason to tell him that they had stolen a getaway car to use for the murder. The three men then had an argument over who was going to do the shooting and Joe finally agreed to do it. Three

hours later, the defendant arrived at Galason's home and stated, "Let's go, let's go, we got to do it now, because his wife was going to see her lawyer that day. Ken Beringer decided not to go, but Joe Beringer picked up a .16-gauge sawed-off shotgun and left with Galason.

Galason testified that the defendant drove him and Joe Beringer to 47th and Western where the stolen car was located. After the defendant reminded them to tell Ken Beringer to destroy his wife's picture, he drove to Skokie. Galason drove the stolen car to an alley near 42nd and Artesian to wait for the defendant's wife. Galason stated that Joe Beringer exited the car and hid by a garage until she appeared. As the victim walked past the alley, Beringer jumped out and shot her twice. He returned to the car and Galason drove it to 49th and Rockwell where they hid the gun in some weeds near the railroad tracks. The two started to walk in different directions when a squad car pulled up and an officer questioned Joe Beringer. At that point, Galason ran toward his home. A few minutes later, the police entered Galason's residence and placed him and Ken Beringer under arrest. Galason confessed to the crime the same day and indicated the killing was done at the request of the defendant. Shortly thereafter, the defendant and Joe Beringer were arrested.

Officer Joe Mikulskis of the Chicago police department, who was the first officer on the scene, testified that he took a brief statement from Harvey Webb, an eyewitness to the shooting. Webb did not testify in the defendant's trial which began January 25, 1983, however he testified at the Beringer brothers' joint trial two months later.

The defendant testified that he did not know Ken and Joe Beringer and had no idea how his wife's photograph got in their possession. He further testified that he met James Galason on July 4, 1979, as a result of a dispute over fireworks. He thereafter began to see Galason because Galason was dating the daughter of Carmen Jagazynski, defendant's friend and insurance client. The defendant admitted that he gave Galason a ride home on the night before the shooting, but he stated that their conversation involved whether defendant's wife would be going to Skokie with him the next day and whether Galason would purchase defendant's motorcycle.

Defendant also testified that at approximately 11:30 a.m. on the day of the homicide, he arrived at Holy Cross Hospital where his wife had been taken. At the hospital, he volunteered to Officer Thomas Ptak that he loved his wife, and "turned frantic" when he learned of her death. The defendant subsequently told the police that a possible explanation for his wife's murder was that she carried a great deal of

jewelry and that there was a rumor in the neighborhood that he and his wife had "a lot of money." His wife, however, was found with jewelry on her person and over $50 in her purse.

I

■ Defendant initially argues that he is entitled to a new trial because the prosecution failed to disclose favorable information within its possession prior to or during defendant's trial denying him due process of law. (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) We disagree.

The record reflects that defendant made a similar argument on April 4, 1983, in support of his motion for a new trial. On that day, defense counsel presented the trial court with a transcript of Harvey Webb's testimony on March 25, 1983, in the Beringer trial in which he identified James Galason as the shooter of defendant's wife. Defense counsel contended that the prosecution violated *Brady v. Maryland* by failing to disclose this information prior to or during defendant's trial since it would have impeached the credibility of Galason who testified at defendant's trial that it was Joe Beringer who pulled the trigger. The trial court determined that the prosecution had two contacts with Harvey Webb; the first was a phone call and the second was a meeting on February 21, 1983. Based on Webb's "two positive assertions" at the Beringer trial, the court found that it was at the February 21 meeting that Webb observed photographs of Galason and Beringer and identified Galason as the shooter. The trial court therefore denied defendant's motion reasoning that the prosecution was under no duty to disclose this information because it was not within the prosecution's control until after the conclusion of defendant's trial on February 2, 1983.

Defendant now maintains that the trial court was not presented with particular statements made by the prosecutor during proceedings in the Beringer trial on March 14, 16, and 25, 1983, which would establish that the prosecution did in fact meet with Webb prior to or during defendant's trial. In the March 14 proceeding, defense counsel for Joe Beringer asked the prosecution if it had a current address for Harvey Webb. The prosecutor responded that no one from the State's Attorney's office had spoken to Webb since prior to the Barkauskas trial, perhaps November or December of 1982. On March 16, 1983, in pretrial proceedings in the Beringer case, defense counsel for Joe Beringer stated that Harvey Webb had indicated to several people that in February 1983 he had been interviewed by an assistant State's Attorney at which time he identified Galason as the shooter. The prosecu-

tor then asserted that he had talked to Webb a couple of times, most recently before the Barkauskas trial, and as far as he knew, Webb had only identified Joe Beringer as the killer. The portion of the March 25, 1983, transcript in the Beringer trial not presented to the trial court discloses that the prosecutor "wasn't sure of the exact date" he met with Webb, but thought it was in January 1983.

After reviewing the proceedings in the Beringer case, we find no reason to disturb the trial court's determination that Webb identified Galason as the shooter for the first time on February 21, 1983. There is no indication from the transcripts now before us that the prosecution possessed any information with respect to Webb's identification of Galason prior to or during defendant's trial. The transcripts simply reveal that the prosecution was uncertain as to the date of its meeting with Webb. The trial court, in light of Webb's two positive assertions at the Beringer trial, resolved the issue by determining that the meeting took place on February 21, and therefore properly denied defendant's motion for a new trial.

Even assuming that the prosecution possessed this information prior to or during defendant's trial, the prosecution was under no duty to disclose it. In order to establish a *Brady* violation, "it must be shown that the evidence was suppressed following a request for it by defendant and that the evidence was favorable to defendant and material either to guilt or to punishment." (*People v. Kosik* (1982), 110 Ill. App. 3d 930, 940, 443 N.E.2d 238.) Materiality in a constitutional sense is not the mere possibility that the undisclosed information might have helped the defense or affected the outcome of the trial. (110 Ill. App. 3d 930, 443 N.E.2d 238; *People v. Williams* (1980), 91 Ill. App. 3d 631, 414 N.E.2d 1235.) Rather, omitted evidence is material if, when evaluated in the context of the entire record, it creates a reasonable doubt of the defendant's guilt. *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; *People v. Kosik* (1982), 110 Ill. App. 3d 930, 443 N.E.2d 238.

We have reviewed the record on appeal and are convinced that the information allegedly withheld by the prosecution, even if presented to impeach the credibility of James Galason, does not raise a reasonable doubt of defendant's guilt. While the information may be relevant to the guilt or punishment of Galason, it in no way rebuts his testimony and the independently corroborated evidence discussed below that the defendant conspired to murder his wife. Thus, the information is immaterial to defendant's guilt or punishment, and accordingly, no *Brady* violation has been demonstrated.

## II ·

■ Defendant next claims that he was not proved guilty of his wife's murder beyond a reasonable doubt because the State's case was based solely on the uncorroborated testimony of a "pathological liar," James Galason, "who traded his story for a light prison sentence." The evidence reveals, however, that Galason confessed to the crime and implicated defendant on the day of the homicide, prior to receiving any promises of leniency from the prosecution. Moreover, it is well established that the determination of the credibility of witnesses is a function of the jury, and this court will not disturb a jury's decision to convict unless the evidence is so improbable as to leave a reasonable doubt of the defendant's guilt. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) Here, we find no reason to reverse the jury's verdict.

We initially note that this case was submitted to the jury with proper instructions setting forth the theory of accountability. A person is legally accountable for conduct of another when:

"Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).

■ Under the principle of accountability, the ample evidence in this case based on James Galason's corroborated testimony establishes defendant's guilt in the murder of his wife. Defendant's admission that he met with Galason on the eve of the murder, the fact that Galason and Beringer knew precisely where the victim would be walking the morning of the homicide, Galason's ability to accurately describe defendant's clothing on the day of the murder corroborated by Officer Thomas Ptak's and defendant's testimony, and Officer Ptak's discovery of a photograph of defendant's wife in the Galason and Beringer apartment, which defendant claimed he lost or was stolen, sufficiently prove defendant's involvement. Furthermore, defendant's "volunteered" statement to Ptak that the crime was motivated by robbery, although the evidence indicated otherwise, corroborates Galason's testimony that that was what defendant requested he tell the authorities if he got caught. Therefore, defendant's argument that he was not proved guilty beyond a reasonable doubt must fail.

### III

Defendant further maintains that he was denied a fair trial because of allegedly prejudicial comments made by the prosecutor during the rebuttal argument and examination of two witnesses. Defendant

first challenges the prosecutor's implication in rebuttal that defendant and his wife were having marital problems and the prosecutor's characterization of defense counsel as a "director" of manufactured testimony.

■ In considering defendant's contentions, we note that a prosecutor is allowed great latitude in closing argument, and absent an abuse of discretion, the trial court's determination as to the propriety of the comments made will be followed. (*People v. Maldonado* (1981), 101 Ill. App. 3d 948, 428 N.E.2d 1087.) Moreover, a defendant cannot claim prejudice if a prosecutor's remarks are either made in response to those of defense counsel (*People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801), or are a comment on the evidence (*People v. Bloodworth* (1979), 68 Ill. App. 3d 341, 385 N.E.2d 904).

■ Here, defense counsel argued in closing that defendant had a good marital relationship and the prosecution failed to produce one witness to corroborate Galason's testimony that defendant told him his wife wanted a divorce. Thus, the prosecutor's comments that he was precluded from questioning the victim's father about his daughter's marriage and that he was unable to contact the victim's divorce attorney were invited by the defense, and as such, were proper. Furthermore, in both instances, defendant's objections were sustained and the jury was instructed to disregard any arguments by counsel which were not based on the evidence. Consequently, any alleged harm was alleviated by the trial court's actions. See *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.

■ We also find no resulting prejudice in the prosecutor's reference to defense counsel as a "director." The record reflects that Harriet Ermel, defendant's next door neighbor, testified that defendant and his wife had an argument on the night before the murder during which defendant stated, "Wait until tomorrow." Defendant testified, however, that his words were, "Can't this wait until tomorrow," referring to the argument itself. The prosecutor subsequently commented in rebuttal argument on how defendant found "some words that would fit into the State's case" which would make his statement to his wife seem innocuous. We believe that the prosecutor's argument was a proper comment on the evidence and the credibility of defendant as opposed to an accusation that defense counsel fabricated a defense and encouraged defendant to testify accordingly.

■ Defendant next contends that the prosecutor's redirect examination of James Galason and cross-examination of Mary Beth Letz, Galason's probation officer, were improper. With respect to the examination of Galason, defendant argues that the prosecutor erroneously

bolstered his testimony by eliciting his prior consistent statements to an assistant State's Attorney on the day of his arrest.

Generally, a witness' prior consistent statements are inadmissible to corroborate his testimony at trial. (*People v. Faysom* (1985), 131 Ill. App. 3d 517, 475 N.E.2d 945.) An exception exists where such statements are offered to rebut a charge or inference that a witness is motivated to testify falsely or that his testimony is a recent fabrication. (*People v. Jackson* (1983), 119 Ill. App. 3d 951, 458 N.E.2d 59.) In this case, the record reveals that defense counsel questioned Galason extensively on cross-examination about alleged inconsistencies in his trial testimony and statements he made previously in his confession. Defense counsel also stated to Galason, "[Y]ou didn't make any statements until you made a deal for twenty years before you would talk to the State's Attorney ***." To refute these assertions of fabrication, the prosecutor properly rehabilitated Galason with his prior confession.

■ Regarding the cross-examination of Letz, defendant argues that it was improper for the prosecution to ask whether she knew "that when James Galason was arrested, he told the police who hired him to kill Joanne Barkauskas." The trial court sustained defense counsel's objection, and, as discussed above, the cautionary instruction given to the jury was sufficient to cure any prejudice.

Even assuming that any of the forgoing remarks by the prosecutor were error, we do not believe in light of the overwhelming evidence of defendant's guilt that they were so prejudicial as to have been a material factor in defendant's conviction or to have denied him a fair trial. See *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

### IV

■ We further reject defendant's claim that the trial court erred in its ruling concerning James Galason's mental-health records from Old Orchard Hospital. Defendant sought to subpoena the records from the hospital and use them to impeach Galason's testimony at trial. Old Orchard Hospital and counsel for Galason, however, objected to the production of the confidential information. Consequently, the trial court conducted an *in camera* inspection of the records outside the presence of the prosecutor and defense counsel, and released the relevant portion of the material consisting of a three-page discharge summary. Defendant contends that by conducting the *in camera* examination in the manner in which it did, the court deprived him of a fair trial under the sixth and fourteenth amendments of the United States Constitution and sections 2 and 8 of article 1 of the 1970 Illinois Constitution and, further, that its action was violative of the provisions of Su-

preme Court Rule 412(h) (87 Ill. 2d R. 412(h)).

Defendant's reliance on *People v. Phipps* (1981), 98 Ill. App. 3d 413, 424 N.E.2d 727, and *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031, to support his argument that Galason's records should have been examined in an *in camera* hearing attended by counsel for both parties to determine what information would be relevant and material to his credibility is misplaced. In *Phipps,* the defendant was charged with battery and maltreatment of mentally retarded people who were witnesses in the case. These witnesses, whose mental-health records the defendant sought to obtain, suffered from psychiatric disorders so severe that they were long-term residents of a mental hospital and were in the institution at the time of the offense and at the time of the trial. The court directed the trial court to issue subpoenas to the mental-health facility and, in the event either a therapist or patient invoked a privilege, directed the trial court to hold *in camera* hearings with attorneys for the State and defendant present.

In *Dace,* the State's chief witness had been previously committed to a mental hospital involuntarily. The trial court, *in camera,* reviewed the file from the witness' commitment proceedings which contained information that she was found to be mentally ill and dangerous, but no mention was made of her diagnosis, treatment or release. On this basis, the trial court ruled that the records were privileged and too old to be relevant. The trial court also barred the defendant from questioning the witness on her mental history. The appellate court held that the trial court could not reasonably conclude from the information before it that the health history of the witness was irrelevant and immaterial, and therefore remanded the case with directions to the trial court to conduct an *in camera* hearing with counsel for both parties if the defendant's requested discovery is challenged.

In the case at bar, 1½ years prior to the offense, Galason was voluntarily admitted by his parents to Old Orchard Hospital where he remained for six months. Unlike the witnesses in *Phipps,* he was not hospitalized at either the time of the murder, the time of defendant's trial, or during the intervening period. While Galason's records from Old Orchard Hospital were not included in the record before us, it appears that he was evaluated as a nonpsychotic and that a diagnosis of his mental health was made. Thus, in contrast to the trial court in *Dace,* the court here had sufficient information to determine what was relevant to Galason's credibility. Moreover, in both *Dace* and *Phipps,* the trial courts refused any discovery to the defendants regarding the mental-health records of the witnesses, whereas in this case, the court conducted an *in camera* examination of Galason's records, provided

both parties with a three-page summary of their contents, and permitted defense counsel to question Galason regarding his stay at Old Orchard Hospital.

The determination of whether material is discoverable and subject to disclosure is to be made by the trial court. (*People v. Coates* (1985), 109 Ill. 2d 431, 488 N.E.2d 247; *People v. Stevens* (1981), 102 Ill. App. 3d 773, 430 N.E.2d 331.) The procedure followed by the trial court in this case adequately protected defendant's right to a fair trial and, at the same time, observed the hospital's and Galason's right to confidentiality in the nonmaterial information contained in the mental-health records. *People v. Stevens* (1981), 102 Ill. App. 3d 773, 775, 430 N.E.2d 331; *People v. Ator* (1976), 37 Ill. App. 3d 304, 309, 345 N.E.2d 211.

## V

■■ We next consider defendant's argument that he was denied effective assistance of counsel because his attorney failed to sufficiently investigate when the prosecution learned of Harvey Webb's identification of Joe Beringer as the killer. Although defense counsel presented the court with Webb's testimony at the Beringer trial during defendant's motion for a new trial, counsel neglected to tender transcripts of additional proceedings on March 14, 16, and 25, 1983, in the Beringer case. Defendant maintains that if these transcripts had been provided, the trial court would have granted his motion. Given our finding above that the additional information would not have altered the trial court's decision to deny defendant's motion, we conclude that defendant did not establish that his counsel's alleged inadequate representation affected the outcome of his trial. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

## VI

Defendant further maintains that the trial court improperly refused to tender two instructions to the jury. The first of these instructions would have charged the jury that "witness James Galason is a narcotics addict and his testimony is subject to suspicion due to the fact that habitual users of narcotics become notorious liars." We find no error in the trial court's refusal to give this nonpattern instruction.

■■ The decision whether to give a nonpattern instruction rests within the discretion of the trial court. (*People v. Larson* (1980), 82 Ill. App. 3d 129, 402 N.E.2d 732.) Moreover, it is settled that an instruction on the credibility of a narcotics addict is improper where it contains an incorrect statement of law (*People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469), or if there is insufficient evidence to

indicate a witness' addiction to narcotics (*People v. McVay* (1981), 98 Ill. App. 3d 708, 424 N.E.2d 922).

▮▮ In the present case, no evidence was produced at trial to support the conclusion that Galason was a "habitual user of narcotics." Galason merely stated that he drank alcohol, smoked marijuana occasionally, and did not consume pills or other drugs. Thus, the jury was made aware of any drug use by Galason and was able to consider its effect on his credibility, as the standard instruction given on witness credibility instructs them to do. Illinois Pattern Jury Instruction, Criminal, No. 1.02 (2d ed. 1981) (IPI Criminal 2d).

▮▮ Defendant also contends that IPI Criminal 2d No. 3.16 was improperly given to the jury. The instruction reads:

> "The defendant has introduced evidence of his reputation for truth and veracity. This evidence may be sufficient when considered with the other evidence in the case to raise a reasonable doubt of the defendant's guilt. However, if from all the evidence in the case you are satisfied beyond a reasonable doubt of the defendant's guilt, then it is your duty to find him guilty, even though he may have a good reputation for truth and veracity."

Defendant argues that because the State alleged his motive to kill his wife was marital problems, the following modified version of IPI Criminal 2d No. 3.16 should have been given:

> "The defendant has introduced evidence of his reputation as a faithful and loving husband. This evidence may be sufficient when considered with the other evidence in this case to raise a reasonable doubt of the defendant's guilt."

It is apparent that defendant's instruction is not merely a modified version of IPI Criminal 2d No. 3.16 as he alleges, but rather a separate nonpattern jury instruction. As previously noted, the decision whether to give a nonpattern instruction is within the sound discretion of the trial court, and once again, we find no abuse of that discretion here.

A review of the record discloses that none of the witnesses mentioned by defendant in his brief testified to defendant's reputation as being a "faithful and loving husband." Rather, they offered their personal opinions based on their own observations of defendant's marital bliss. As such, the proposed instruction was not supported by the evidence. Moreover, even if we were to consider defendant's instruction a form of IPI Criminal 2d No. 3.16, our research has revealed no case which has held that being a "faithful and loving husband" is an appropriate character trait to be included in that instruction.

Even assuming error occurred when the trial court refused to tender defendant's nonpattern jury instructions, reversal is not required

unless defendant was so prejudiced as to affect the jury's verdict. (*People v. Bertucci* (1980), 81 Ill. App. 3d 851, 401 N.E.2d 1123.) Defendant has failed to demonstrate that any such prejudice resulted in this case.

### VII

Lastly, defendant urges that his sentence to natural life in prison is excessive and should be reduced to 30 years. In support of this argument, defendant asserts that he was 26 years old at the time of sentencing, was employed at the time of his arrest, and complied with the bond conditions for two robbery convictions in 1976.

Our examination of the record before us reveals that the trial court thoroughly considered those factors now articulated by defendant as well as other mitigating evidence that was presented. The court, however, properly weighed against these factors the necessity of an adequate punishment for the crime committed. In this regard, the court found that defendant "in a cold and calculating way did spearhead the tragic events" leading to his wife's murder. The court also found that the confessions of Joe and Ken Beringer introduced in aggravation supported the "depth of the culpability of defendant," particularly where Joe Beringer stated that defendant told him to make sure his wife was dead and that any leftover insurance money would be his and Galason's.

The imposition of a sentence is within the discretion of the trial court (*People v. Almo* (1985), 108 Ill. 2d 54, 70, 483 N.E.2d 203), and absent an abuse of that discretion, this court cannot modify the sentence. (*People v. Cox* (1980), 82 Ill. 2d 268, 280-81, 412 N.E.2d 541.) In the present case, the crime was of a particularly heinous nature, and we conclude that the trial court did not abuse its discretion in sentencing defendant to life imprisonment.

For the forgoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.