THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MACK L. SAXON, Defendant-Appellant.

Third District    No. 3—91—0389

Opinion filed March 9, 1992.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

William Herzog, State's Attorney, of Kankakee (John X. Breslin and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

A jury found the defendant, Mack L. Saxon, guilty of robbery, resisting a peace officer, and two counts of aggravated battery (Ill. Rev. Stat. 1989, ch. 38, pars. 18—1, 31—1, 12—4(b)(2), (b)(6)). The court thereafter sentenced him to concurrent prison terms of six years for robbery, five years for each of the aggravated battery convictions, and 364 days for resisting a peace officer. The defendant appeals.

At trial, James Davis testified that on the night in question he was approached by two black men outside his home. One, whom he could not identify, wore a ski mask. The other, whom he identified as the defendant, wore a Bulls jacket. Davis agreed to give the masked man a ride on his snowmobile, leaving the defendant behind. When they returned about five minutes later, the defendant and another snowmobile belonging to Davis were gone. Davis dropped off the masked man and chased the second snowmobile. When he caught up to it he hit it, causing the defendant to slide off. The defendant told Davis that a man at Davis' house told him he could take the snowmobile. He then apologized for taking it.

As the defendant was trying to help Davis get the snowmobiles out of the ditch, two men pulled up in a car. The masked man got out, jumped on one of the snowmobiles and said he was taking it to Davis' house. When Davis told him to get off and leave it there, the masked man stood up, walked behind Davis and grabbed his arms. The defendant then hit Davis in the face and the masked man threw him down. The defendant and the masked man then drove off on one of the snowmobiles. Davis flagged down a car, returned home, and called the police.

Davis reviewed two statements he had given to the police on the night in question. In defendant's exhibit 1, he stated that Odell Frazier was the person who hit him. Davis explained that the reason he said this was because the police had picked up Frazier wearing a Bulls jacket. It is not clear from the record whether Davis actually saw Frazier after the police brought him in and that was how he knew Frazier was wearing a Bulls jacket, or whether the police told

Davis that the man they picked up who was wearing the Bulls jacket was named Frazier and Davis never saw him.

Davis also acknowledged that in his second statement to the police (People's exhibit 9) he had said the masked man struck him in the face. However, at trial, Davis asserted that this statement was wrong. He testified that when he first saw the defendant at his house, his porch light was on and lit up the whole yard. He stood a foot from the defendant, who was wearing a Bulls jacket. They talked for about five minutes. Davis also stated that the car's headlights were on at the scene where he was struck and his snowmobile was taken. The headlights gave him enough light to identify the defendant.

Police officer Steve Abrassart testified that after interviewing Davis, he was following a set of snowmobile tracks when he received a radio communication to meet with Officer Francis Monney, who had Frazier in custody. Frazier was wearing a Bulls jacket. Abrassart picked them up and subsequently stopped a car which Davis had described as the one involved in the incident. The car was driven by Gene Pickens. Abrassart then followed Pickens to his house trailer. A snowmobile was parked near the trailer. After obtaining the snowmobile keys from Pickens, Abrassart entered the trailer with Monney and Officer Harry Powell, who had arrived about the same time. Inside the trailer they encountered a woman, some children, and the defendant, who said his name was Al. The defendant's gym shoes were sopping wet but his cheek was warm to the touch.

At Abrassart's request, the defendant exited the trailer, but ran away when he was told he was under arrest. The police chased the defendant to another home. Abrassart entered the house along with Monney, Powell, Sergeant Aurelio Garcia, Detective Dave Williams, Officer Dave Zinanni, and a police dog. They eventually found the defendant hiding under a table in the basement. When the defendant refused to come out, Abrassart reached for him, but he pulled out a knife. Abrassart grabbed the knife, and Powell applied a stun gun to the defendant's back. Monney also used a stun gun. The defendant immediately came out kicking and hitting. When Abrassart, Monney, and Powell wrestled with the defendant in an attempt to subdue him, Abrassart was struck in the eye. Abrassart believed the defendant hit him, but he did not actually see who did it. He did see the defendant strike Monney. After he was taken into custody, the defendant was taken to a hospital, where he was treated for a bleeding finger and cuts to his head.

Abrassart also testified that in the statement he took from Davis, Davis said he was hit by Frazier. The statement indicated that Davis

was hit by the man who wore the ski mask. Davis also told Abrassart that he was hit by both men, but Abrassart did not include that point in the statement. Abrassart further stated that the police supplied Davis with Frazier's name. Davis also told Abrassart that, at the scene of the snowmobile taking, the man in the Bulls jacket was the stocky, short, strong young man, and that was not Frazier.

Several other officers who were involved in the incident testified at trial. Pertinent portions of their testimony, which largely corroborated Abrassart's, are summarized below.

Officer Harry Powell and Deputy Francis Todd Monney testified that they had been dispatched to Davis' house on the night of the incident. They followed a set of snowmobile tracks past Pickens' house, where they saw a snowmobile being ridden by two people. When the person on back fell off, Monney exited the car, chased, and caught him. Powell identified the man as Frazier. Monney stated that Frazier was wearing a black jacket which looked like People's exhibit 6, the Bulls jacket.

Monney and Frazier were subsequently picked up by Abrassart. They and Powell later arrived at Pickens' girl friend's trailer by following the snowmobile tracks. Monney testified that a set of footprints led from the snowmobile to the trailer. Pickens answered when they knocked on the door. Three men were inside, including the defendant, although they all asserted that no one in the trailer was named Mack. Powell and Monney corroborated Abrassart's testimony that the defendant ran from them when Monney told him he was under arrest.

Powell, Monney, Officer Garcia, Officer Dean Dandurand, Detective David Williams, and Deputy David Zinanni testified that they pursued the defendant to the house referred to in Abrassart's testimony. Powell, Monney, Williams, and Zinanni entered the house with Abrassart, while the others waited outside.

Monney corroborated Abrassart's testimony that the defendant refused to come out from under the table and pulled a knife. During the course of the struggle, Powell used a stun gun on the defendant three times and Monney used a stun gun once. According to Powell, a stun gun either immobilizes a person or makes him angrier and gives him added strength. It does not cause a person to flail his arms and legs with no control over what he is doing.

Garcia, Powell, and Monney testified that while they were wrestling with the defendant, he swung his arms and kicked at all of them. Garcia stated that the defendant punched Abrassart and kicked Monney. Powell stated that the defendant kicked his knee and struck

his head. Williams stated that the defendant was not punching or kicking at the officers, but moving his hands and feet so the officers could not grab him. However, he also stated that he saw the contact between the officers and the defendant for only a couple of seconds as he had to direct his attention to another person who was coming down the basement stairs.

Darrin Hayes testified that he and five other people were present at his grandmother's house when the defendant, whom Hayes had known for a couple of years, rang the doorbell. The defendant told them he had been jumped and needed a ride to his mother's house. According to Hayes, the defendant's hand was bleeding. Shortly thereafter, the police arrived. Hayes stated that he saw the police officers punching the defendant in the basement.

Gene Pickens testified that he had borrowed the defendant's car that morning. Pickens claimed that he drove around all day with Odell Frazier and Frazier's cousin, Mike. Pickens did not know Mike's last name. He stated that Frazier wore a hat and a stone-washed jacket, and Mike wore a Bulls jacket. According to Pickens, while driving they came upon some men standing by snowmobiles and asked them if they wanted to have a snowball fight. The men answered something "smart" and Mike continued driving. After they had gone about a block, Mike stopped the car and got out with Frazier. Without saying what they were going to do, Mike asked Pickens to pick them up on the same street. They then walked back toward the men with the snowmobiles. Shortly thereafter, Pickens began driving in the direction Mike and Frazier had gone. As he drove, he was passed by a snowmobile and he saw Frazier running. He picked up Frazier and subsequently came upon a snowmobile in a ditch. Mike and a third person were standing by it. When Frazier got out of the car, Mike pushed the third person in the ditch. Pickens then drove away by himself.

Pickens stated that he drove to his mother's house, which was about 15 minutes away. About one-half to one hour later, Frazier and Mike drove up on a snowmobile, stayed for about 10 minutes, and left. Pickens then drove to his girl friend's trailer, which took about 15 minutes. He saw a snowmobile parked across the street. His girl friend was not home but her three children and the defendant were there. His girl friend and the police arrived thereafter. After talking to the police, Pickens told the defendant they suspected him of stealing a snowmobile. The defendant denied it and said he was not going back to prison. He ran away when the police tried to arrest him.

Pickens admitted giving a statement to the police in which he had said the defendant was involved with Frazier in stealing a snowmobile. He testified that he substituted the defendant for Mike in his statement because Mike had threatened to burn his house down if he told the police about his involvement.

The defendant testified that about 12 p.m. on the day of the incident, he drove his car to Pickens' house to be fixed. A friend gave him a ride back to his house. About 6 p.m., a friend drove him to Pickens' house, but Pickens was not there. The defendant's friend then took him to Pickens' girl friend's trailer. Pickens' girl friend let him in, and he waited there for Pickens, who finally arrived. The police came shortly thereafter. When asked by the police, the defendant denied being on a snowmobile that day. He ran when he was told he was under arrest because he had previously been convicted of a felony and did not want to go to jail for something he did not do. He also claimed that he attempted to give himself up later at the Hayes' house, but the police beat him, saying, "Oh you want to run? I am going to teach your ass about running." He denied hitting any of the officers. He was later taken to the hospital, where he was treated for fractured ribs and cuts to the head.

Maggie Piper, the mother of three children by Gene Pickens, testified that about 6 p.m. on the day in question, the defendant came to her trailer. He was wearing a blue jean outfit.

Following the above-summarized testimony, certified copies of the defendant's two prior felony convictions were introduced into evidence. The jury found the defendant guilty of the above-noted charges. Specifically, as to the aggravated batteries, he was found guilty of having caused Davis bodily harm by striking him in the face while masked and of causing bodily harm to Powell knowing him to be a peace officer engaged in the execution of his official duties. He was found not guilty of committing an aggravated battery against Officer Abrassart.

On appeal, the defendant first argues that his robbery conviction and his aggravated battery conviction with respect to Davis should be reversed because Davis' in-court identification of the defendant was contradicted by his earlier statements to the police. Specifically, he notes that in one statement to the police, Davis identified "Frazier" as the one who struck him. In the other statement he identified "the man in the mask" as the one who struck him.

■■ Upon review of a conviction, this court must examine all the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the defendant

guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) This standard applies to identification of a defendant. (*People v. Maloney* (1990), 201 Ill. App. 3d 599, 558 N.E.2d 1277.) Variations between the trial testimony of a witness and pretrial statements present credibility questions to be decided by the trier of fact. *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.

Initially we note, as we did in the recitation of facts above, and contrary to the defendant's assertion on appeal, that it is unclear from the record whether in his original statement to police Davis identified Frazier as the one who struck him because he actually saw Frazier in the Bulls jacket after the police had apprehended him, or because the police told Davis that the man they brought in who was wearing the Bulls jacket was named Frazier. Therefore, it is far from certain that Davis' first statement to the police actually contradicted his trial testimony that the defendant was wearing a Bulls jacket when he hit Davis. We note also that the defendant and Frazier could have switched jackets after taking the snowmobile. In any event, we find that Davis' in-court identification of the defendant was strong and there was sufficient evidence which corroborated that identification.

First, Davis stated in court that the defendant looked just like the man who was wearing the Bulls jacket on the night in question. Davis asserted that he saw the defendant at close range on two occasions on the night he was attacked. The first time was at his home in a well-lit area where he stood close to the defendant and talked to him for five minutes before leaving to give the masked man a ride. The second time was when he was attacked in the area where the car's headlights were shining, which gave him enough light to identify the defendant. Davis also testified that the statement that identified the man in the ski mask as the one who hit him was wrong because it had been written down wrong.

Additionally, Davis testified that both men attacked him. Officer Abrassart testified that Davis had told him this. Abrassart also testified that Davis told him that the man at the scene in the Bulls jacket was the short, stocky young man. People's exhibits 10 and 11, photographs of the defendant and Frazier, were identified by Sergeant Garcia at trial. From his testimony, the jury heard that Frazier appeared to be 5 feet 8 inches in his picture while the defendant appeared to be 5 feet 6 inches.

We note also that defense counsel thoroughly cross-examined Davis concerning the apparent conflict between his prior statements and his trial testimony. Further, the jury was instructed that a prior

inconsistent statement could be used to challenge the credibility of a witness. Thus, the issue was fully before the jurors and it was for them, as the triers of fact, to decide what weight to give Davis' testimony.

Finally, we note that Davis was unequivocal in his testimony at trial that the defendant was present and fully participated in the robbery and aggravated battery. Therefore, the defendant was criminally responsible for his companion's conduct under the principle of accountability (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c)), which the jury was instructed about. Thus, after viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence presented to the jurors from which they could properly infer that the defendant actively participated in both the robbery and aggravated battery of Davis.

The defendant next contends that his robbery conviction should be reduced to theft because the taking of Davis' property was not accompanied by the use or threat of force.

The robbery statute requires that property be taken "from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1989, ch. 38, par. 18—1(a).) The forcible taking of property is thus the gravamen of the offense and serves to distinguish robbery from theft. Ill. Rev. Stat. 1989, ch. 38, par. 16—1; see *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.

The defendant argues that Davis' snowmobile was taken while Davis was giving the masked man a ride and, therefore, the taking was not accompanied by the use or threat of force as required for the offense of robbery. We disagree.

Although initially the defendant took Davis' snowmobile when Davis was giving the masked man a ride, Davis returned within five minutes and shortly thereafter caught up with the defendant. The defendant claimed that a man at Davis' house had given him permission to take the snowmobile. He then apologized to Davis. At that point, the defendant would have had an arguable case that he had not committed theft because he had not knowingly obtained or exerted unauthorized control over the snowmobile. The defendant could have walked away or asked to return the snowmobile to Davis. Instead, the masked man came, jumped on Davis' snowmobile, and when Davis told him to get off, he arose and approached Davis from behind. The defendant did not move to help Davis, or remain uninvolved, but rather assisted in assaulting Davis after the masked man had grabbed Davis' arms.

In our view, the robbery was complete when the defendant and the masked man faced the lone victim, Davis, and obviously threatened the imminent use of force. Given the entire context of what happened here, we conclude that the taking of Davis' snowmobile was accomplished by the threat of the imminent use of force.

■ The defendant argues in the alternative that if his robbery conviction is affirmed, his aggravated battery conviction (against Davis) should be vacated because the act forming the basis for that conviction constituted the force which transformed the taking of the snowmobile into robbery. He also asserts that the aggravated battery was a lesser included offense of the robbery.

We note that the aggravated battery which the defendant was charged with, and on which the jury was instructed, was committing a battery while hooded or masked in such a manner as to conceal his identity. (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(2).) The burden of proof instruction the jury received stated that the State had to prove that the defendant, or one for whose conduct he was legally responsible, was hooded or masked so as to conceal his identity. The jury was also instructed on accountability. (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c).) The evidence showed that the defendant's masked companion grabbed Davis' arms and threw him down. The defendant was not charged with, nor found guilty of, aggravated battery by reason of having struck Davis in the face himself. He was held accountable for his masked companion's aggravated battery of Davis. Thus, this aggravated battery did not form the basis for the robbery conviction.

We note that the defendant has cited no authority for his proposition that aggravated battery is a lesser included offense of robbery. A lesser offense is one whose elements are all included within the greater offense. (*People v. Smith* (1980), 78 Ill. 2d 298, 399 N.E.2d 1289.) In the instant case, the aggravated battery of Davis required proof that the perpetrator's identity was concealed. The robbery did not. Therefore, the aggravated battery was not a lesser included offense of robbery.

The defendant next argues that his aggravated battery conviction against police officer Harry Powell should be reversed because the State failed to prove beyond a reasonable doubt that he struck Powell knowingly or with the intent to do him harm.

We note again that upon review of a conviction, we must examine all the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

■ We find ample evidence to support the defendant's conviction for the aggravated battery of Powell. Powell specifically testified that the defendant kicked him in the knee and struck his head. He said the defendant was fighting with the officers and would not obey their commands or allow them to cuff him. Powell also testified that the application of a stun gun does not cause a person to uncontrollably flail his arms or legs, but may increase his anger. We also note that before any use of the stun gun by the officers, the defendant pulled out a knife and refused to drop it.

Additionally, to the extent that Officer Williams' testimony appeared to conflict with Powell's, that conflict was for the jury to decide. It is noteworthy that Williams stated that he was only able to observe the confrontation between the defendant and the other police officers for a few seconds, as he was busy with the man who came down the stairs. Finally, the testimony of Officers Abrassart, Monney, Garcia, and Zinanni all supported the characterization of the defendant as knowingly striking out at them in an attempt to avoid being taken into custody. Thus, after viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence presented to the jurors from which they could properly determine that the defendant knowingly struck Powell while Powell was engaged in the execution of his official duties.

The defendant also argues that the prosecution's closing argument denied him a fair trial. He contends the prosecutor read verbatim to the jury Gene Pickens' written statement that he gave to the police in which he stated that the defendant was involved in taking Davis' snowmobile, thus improperly overemphasizing Pickens' pretrial statement over his trial testimony. Additionally, the defendant claims that the prosecutor misstated Pickens' trial testimony during her closing argument and improperly stated that Pickens had lied on the stand and she would not vouch for his testimony.

It is well established that a prosecutor has great latitude in making closing arguments, and absent a clear abuse of discretion, the trial court's determination as to the propriety of the comments will not be disturbed. (*People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 497 N.E.2d 1183.) A prosecutor can argue any logical inference which can be drawn from the evidence. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) It is within the sound discretion of the trial court to permit counsel to read from the trial transcript during closing arguments. *People v. Davies* (1977), 50 Ill. App. 3d 506, 365 N.E.2d 628.

■ In the instant case, the prosecutor read to the jury the majority, not all, of Pickens' statement. This portion of the prosecutor's ar-

gument took less than one page of the transcript and was interspersed with her comments on the statement. As in *Davies* cited above, we find that the excerpts were relatively brief and accurately quoted. The readings were not so extensive as to improperly emphasize that particular evidence to the defendant's prejudice.

The defendant also complains that the prosecutor misstated Pickens' trial testimony when she claimed there was a "15 minute gap" or "time lapse" in his testimony.

We note that defense counsel objected to the prosecutor's remarks as a mischaracterization of Pickens' testimony. In overruling the objection, the judge said, "[T]he jury heard the evidence. They have taken notes. I have instructed them that if their memory of the testimony doesn't agree theirs is what counts." The jury was also instructed that closing arguments were not evidence and any argument not based on the evidence should be disregarded. Therefore, we find that if there was any error in the prosecutor's remarks, it was harmless since the jury was properly instructed.

The defendant finally argues that the prosecutor improperly stated that Pickens took the stand and lied and improperly stated that she could not vouch for Pickens' credibility.

We note that following these remarks, defense counsel objected and the trial court sustained the objection. The court told the prosecutor in front of the jury that she could not argue personal beliefs or inject herself into the case and although she could argue credibility, she could not vouch or not vouch for a witness. When a judge sustains objections defense counsel makes to an argument, that is generally enough to cure error in the argument. (*People v. Harris* (1989), 132 Ill. 2d 366, 547 N.E.2d 1241.) Improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.) Here, the evidence of guilt was so overwhelming that any error resulting from prosecutorial indiscretion was harmless. Her actions therefore did not constitute reversible error.

For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

Affirmed.

McCUSKEY and SLATER, JJ., concur.