THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TABITHA POLLOCK, Defendant-Appellant.

Third District   No. 3—96—1077

Opinion filed December 10, 1999.

Tracy McGonigle, of State Appellate Defender's Office, of Chicago, for appellant.

Ted J. Hamer, State's Attorney, of Cambridge (John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOMER delivered the opinion of the court:

The defendant, Tabitha Pollock, was convicted of first degree murder (720 ILCS 5/9—1 (West 1996)) and sentenced to 36 years in prison. On appeal, she contends: (1) the State failed to prove beyond a reasonable doubt that she knew that her boyfriend was beating her daughter; (2) the State deprived her of a fair trial when, during closing arguments, it vouched for the credibility of one of its witnesses and misstated the law on accountability; (3) the trial court erred in giving nonpattern jury instructions on accountability; (4) the trial court erred in admitting evidence of the defendant's prior bad acts; and (5) the truth-in-sentencing law is unconstitutional. We modify the defendant's sentence to allow her to receive day-for-day good-time credit and in all other respects affirm the judgment of the circuit court.

## FACTS

In the early morning hours of October 10, 1995, emergency medical personnel responded to a call from the home in which the defendant lived with her boyfriend, Scott English. Also residing in the home were her three children, English's parents, the girlfriend of English's brother and the girlfriend's child. When the emergency crew arrived at the home, they found the victim, the defendant's 3½-year-old daughter, lying on the floor of an upstairs bedroom. The defendant was attempting to perform cardio-pulmonary resuscitation. The crew transported the child and the defendant to the hospital.

At the hospital, medical personnel attempted for an hour to revive the victim. When their efforts proved fruitless, the treating physician informed the defendant that her daughter was dead. The treating physician testified at the defendant's trial that he had sutured a laceration on the victim's head a few days before her death. At that time, he did not suspect child abuse because injuries of that nature are not uncommon in small children. However, when the victim was brought in on the morning of her death, the doctor suspected foul play and instructed the attending nurse to document the victim's injuries.

The attending nurse testified that she noted 11 injuries, 10 of which could have indicated child abuse. The victim had bruises on her back, her left elbow, her left buttock, her left ribcage and her right hip.

The forensic pathologist who conducted the autopsy on the victim determined the cause of death to be blunt force trauma and asphyxiation. The doctor observed over 100 bruises in various stages of healing on the victim's body, including bruises on her chest and abdomen which would have been inflicted in the hours before her death. The doctor also noted curved claw marks on the victim's chest that exactly matched the victim's left fingernails. He testified that these wounds are typically found when a victim has been strangled and, in the moments preceding death, has used her fingernails to claw at the object that is strangling her. The doctor found small ruptures of the blood vessels in the victim's face, which suggested that something had been held over the victim's nose and mouth.

When the doctor conducted her internal examination of the victim, she found 13 distinct hemorrhagic injuries to the victim's skull. Eight of these injuries were three to four days old. The internal examination also revealed more extensive bruising of the victim's chest, abdomen and head.

The defendant's boyfriend gave a statement to police in which he admitted striking the victim in the head shortly before she was found dead. He told the police that the victim had recently begun winding

herself up in her blanket as she slept. On that night, the boyfriend found the victim asleep with her blanket wound around her. He struck her in the back of the head to make her stop winding herself in the blanket. When he checked on the victim a little while later, he noticed that she was not breathing and carried her into the room he shared with the defendant.

When she was questioned by police, the defendant denied ever striking the victim and denied knowing about any abuse of the victim. She did tell the police that she had noticed injuries to the children in the weeks preceding the victim's death. She noticed marks on her son's neck, and her son told her that her boyfriend had choked him. The boy also told her that he had been injured when playing with friends. Her boyfriend said he mistakenly grabbed the boy around the neck when the boy began to fall while in the bathtub. The defendant also told the police about a similar incident in the bathtub which resulted in injuries to the victim. According to the defendant, her boyfriend told her that the victim attempted to get into the bathtub and stepped on the youngest child. When the boyfriend pushed the victim off the youngest child, the victim slipped and fell and was bruised.

The defendant told police of other incidents when she found bruises on the victim's face and believed they were caused by falls from the bed. Once, her boyfriend told her that the victim had been injured when she "fell" down the stairs and into a chair at the bottom. Days before the victim's death, the defendant returned home to find that the victim had supposedly fallen off a stool while trying to reach the toothpaste on the bathroom counter. Her fall on that occasion resulted in stitches to her head.

In her statement, the defendant said that she and her boyfriend split the task of disciplining the children evenly. She knew that the victim believed that her boyfriend was "mean," and she knew that her boyfriend thought that the victim was a "momma's girl."

According to the defendant, her boyfriend had arrived home at 12:40 a.m. on the morning of the victim's death. The children were in bed. Her boyfriend checked on the children once and returned to tell the defendant that the victim had been wrapped up in her blankets but he had fixed them. Later, her boyfriend checked on the children again. Finally, around 5 a.m., her boyfriend brought the victim into their bedroom, telling the defendant that something was wrong with the victim.

The defendant's mother and sister testified that they had seen bruises on the defendant's children after the defendant moved in with her boyfriend. The children told stories about the defendant's

boyfriend choking them, but the adults dismissed the stories. Neither the defendant's mother nor sister suspected that the defendant's boyfriend was abusing the victim.

A friend of the defendant, and a babysitter for the children, testified that she had observed bruises on the victim after the defendant moved in with her boyfriend. On one occasion, the victim told the babysitter that the defendant's boyfriend had choked her. The victim illustrated her claim by placing her hands around her throat. The defendant was there and saw and heard the victim's claim. However, the defendant dismissed the allegations because of the victim's age.

Several witnesses for the State testified that the defendant did not keep her children, or their clothes, clean. Some of the witnesses had reported the defendant to the Department of Children and Family Services (Department) for this reason. The Department, however, had never found any evidence of abuse regarding the defendant's children.

One witness testified that on one occasion the defendant instructed her two oldest children, the victim and her older brother, to walk alone along the Mississippi River late at night in order to retrieve an item that had been left on the bank. This witness further testified that the defendant had allowed the victim to climb a bookcase which nearly fell over on top of the victim. Someone other than the defendant had to rescue the victim before she was hurt.

Many witnesses testified that the defendant was a caring mother who never abused her children. These witnesses testified that the children never showed signs of physical abuse.

During closing arguments, the State asked the jury to remember how the defendant's friend and babysitter had looked when she took the witness stand. The State characterized the look as "apologetic" and argued that the babysitter knew she would be getting the defendant into trouble with her testimony. The State further argued that the babysitter had no reason to come into court and lie about her friend. The State touched on the law of accountability in its argument as well. It noted that the law of accountability "has expanded" to include cases in which a parent fails to protect a child from an abuser.

At the conclusion of the trial, the court gave the standard accountability jury instruction. Illinois Pattern Jury Instructions, Criminal, No. 5.03 (3d ed. 1992) (hereafter IPI Criminal 3d). That instruction provides that "[a] person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." IPI Criminal 3d No. 5.03.

Over the defendant's objection, the trial judge also instructed the jury using three nonpattern instructions. These instructions were based upon the decision in *People v. Stanciel*, 153 Ill. 2d 218, 606 N.E.2d 1201 (1992). State's instruction No. 10 stated: "A parent has a legal duty to aid a small child if the parent knows or should know about a danger to the child and the parent has the physical ability to protect the child. Criminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so." State's instruction No. 11 read: "Actual presence at the commission of a crime is not a requirement of accountability." Finally, the court gave State's instruction No. 13: "For accountability, intent to promote or facilitate crime may be shown by evidence that the defendant shared a criminal intent of the principal or evidence that there was a common criminal design."

The jury deliberated and returned a verdict of "guilty." After a sentencing hearing, the trial judge sentenced the defendant to 35 years in prison. Pursuant to the truth-in-sentencing law, the defendant was required to serve 100% of her sentence.

## ANALYSIS

### Reasonable Doubt

The defendant argues first on appeal that the State failed to prove beyond a reasonable doubt that she knew or should have known that her boyfriend was abusing her daughter. In support of her argument, she notes that many of the witnesses who testified at trial denied any knowledge of the abuse of the victim.

In assessing whether the defendant has been proven guilty beyond a reasonable doubt, the relevant question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 478 N.E.2d 267 (1985). The reviewing court may not substitute its judgment for that of the trier of fact with regard to the weight of the evidence and the credibility of the witnesses and should not reverse a conviction unless the evidence is so improbable, unreasonable or unsatisfactory as to justify a reasonable doubt concerning the defendant's guilt. *People v. Singletary*, 237 Ill. App. 3d 503, 604 N.E.2d 1009 (1992).

Here, the defendant herself told the police that on many occasions when her boyfriend had been left with the children, she returned home to find them bruised. These injuries were always attributed to "accidents." The defendant's boyfriend "accidentally" grabbed her son around the neck. He "accidentally" pushed the victim down in the bathtub. The victim "accidentally" fell down the stairs, in the

bathroom while reaching for toothpaste, and off the bed. Moreover, the defendant acknowledged that both the victim and the victim's older brother had told the defendant that her boyfriend had choked them. The victim even illustrated her allegation by placing her hands on her throat. In this instance, the mysterious injuries to the children and their complaints against the defendant's boyfriend should have told the defendant that her boyfriend was abusing her children. She could not turn a blind eye and a deaf ear and then hope to avoid accountability when her boyfriend's abuse turned fatal. We hold that the evidence was not so improbable, unreasonable or unsatisfactory as to justify a reasonable doubt concerning the defendant's guilt.

### Closing Argument

Next, the defendant maintains that the State deprived her of a fair trial when it vouched for the credibility of its witness and misstated the law of accountability in its closing argument.

■ It is well settled that the State has wide latitude in making its closing remarks. *People v. Barkauskas*, 147 Ill. App. 3d 360, 497 N.E.2d 1183 (1986). The State's argument must be examined in its entirety and the complained-of comments placed in their proper context. *People v. Morgan*, 142 Ill. 2d 410, 568 N.E.2d 755 (1991). Improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. *People v. Thompkins*, 121 Ill. 2d 401, 521 N.E.2d 38 (1988). Such remarks must constitute a material factor in the defendant's conviction without which the jury might have reached a different result. *People v. Lyles*, 106 Ill. 2d 373, 478 N.E.2d 291 (1985). Moreover, improper comment by counsel may be cured by providing proper instructions of law. *People v. Hobley*, 159 Ill. 2d 272, 637 N.E.2d 992 (1994).

■ In the instant case, the trial judge properly instructed the jury about its role in determining the credibility of the witnesses and the amount of weight to place upon closing arguments. The State's closing argument, viewed in its entirety, did not result in substantial prejudice to the defendant. Thus, we hold that the defendant was not deprived of a fair trial by the State's closing argument.

### Jury Instructions

Third, the defendant contends that the trial court erred in giving nonpattern jury instructions.

■ It is well settled that a trial judge has the discretion to give nonpattern jury instructions. *People v. Hudson*, 157 Ill. 2d 401, 626 N.E.2d 161 (1993). A pattern instruction is to be used, unless the court determines that it does not accurately state the law, in which case the instruction given on that subject should be simple brief, impartial, and free from argument. 134 Ill. 2d R. 451(a).

Here, the trial court gave IPI Criminal 3d No. 5.03, the pattern accountability jury instruction. Over the defendant's objections, the court also gave three non-IPI instructions on accountability tendered by the State.

We have carefully examined the instructions given in this case. We conclude that, when considered together, the accountability instructions correctly state the law applicable to this case. See *People v. Tracy*, 291 Ill. App. 3d 145, 154, 683 N.E.2d 182, 188 (1997).

■ The trial court was justified in determining that IPI Criminal 3d No. 5.03 was inadequate to inform the jury of the defendant's legal duty, as a parent, to protect her child from preventable crimes. The terms "solicits," "aids," "abets," and "agrees [or attempts] to aid" do not naturally lend themselves to a determination of parental accountability as that concept was developed in *Stanciel*, 153 Ill. 2d 218, 606 N.E.2d 1201. On the other hand, the three non-IPI instructions given in this case and taken from the *Stanciel* decision, in conjunction with IPI Criminal 3d No. 5.03, accurately state the law of this case in a manner that is simple, brief, impartial and free from argument. Consequently, we hold that the trial court did not abuse its discretion in giving the nonpattern instructions.

### Prior Bad Acts

Fourth, the defendant argues that she was deprived of a fair trial when the judge allowed the State to introduce evidence of her prior bad acts. Specifically, she challenges the testimony with regard to her sending her children to retrieve an item left along the Mississippi River, failing to rescue the victim when she climbed on a bookcase and failing to keep the children and their clothes clean.

■ Initially, we note that the defendant has waived this claim because she failed to raise it in a posttrial motion. See *People v. Williams*, 181 Ill. 2d 297, 692 N.E.2d 1109 (1998). Once an alleged error has been waived, we can review it only if the error constitutes plain error. 134 Ill. 2d R. 615(a). Plain error is error of such magnitude that it denied the defendant a fair trial or error in a trial where the evidence is closely balanced. *People v. Whitehead*, 116 Ill. 2d 425, 508 N.E.2d 687 (1987).

In the instant case, the evidence was not closely balanced nor was the defendant denied a fair trial. The defendant, by her own testimony, established that she should have known that her boyfriend was abusing her children, and the victim in particular. Moreover, she was allowed to call many other witnesses who testified that she was a caring mother who never abused her children. Accordingly, we hold that the defendant has waived her claims in this regard and the plain error rule does not apply.

## Sentencing

Finally, the defendant claims that the truth-in-sentencing law is unconstitutional.

■ The Illinois Supreme Court recently held that Public Act 89—404 (Pub. Act 89—404, eff. August 20, 1995 (amending 730 ILCS 5/3—6—3 (West 1994)), which contained the truth-in-sentencing law, was adopted in violation of the single-subject rule contained in the Illinois Constitution. *People v. Reedy*, 186 Ill. 2d 1 (1999). As a consequence, the court held that Public Act 89—404 was unconstitutional in its entirety. In accordance with *Reedy*, therefore, we hold that the defendant is eligible to receive the good-conduct credit that she would have been eligible to receive prior to the enactment of Public Act 89—404. We order all contrary references stricken from the sentencing order.

## Conclusion

For the foregoing reasons, the judgment of the circuit court of Henry County is affirmed as modified.

Affirmed as modified.

HOLDRIDGE, P.J., and KOEHLER, J., concur.